(No. 45758.—

BERTRAM F. TEMPLETON, Appellant, v. JACK C. HUSS *et al.,* Appellees.

*Opinion filed March 29, 1974.—Rehearing denied May 31, 1974.*

Phillips, Phebus, Tummelson & Bryan, of Urbana (Enos L. Phillips, Darius E. Phebus, Joseph W. Phebus and E. Phillips Knox, of counsel), for appellant.

Webber, Welsh & Kehart and Jokisch & Patton, both of Decatur (Richard J. Welsh, Edwin W. Jokish, Jr., and Jerry L. Patton, of counsel), for appellees.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Bertram F. Templeton, since 1931 the owner of farm land situated southwest of the village of Oreana in Macon County, brought an action in 1964 against Jack C. Huss, Adair D. Huss, John M. Oldweiler and Eugenia J. Oldweiler, the owners of an adjoining parcel of farm land which they were then in the process of subdividing for single-family detached housing. The original complaint alleged that these defendants "in subdividing their said real estate, have, by artificial means, changed the surface drainage of their said lands in such a manner that surface waters now flow from the Defendants' lands onto the Plaintiff's land at a place other than the place or places at which such waters flowed onto the Plaintiff's land in a state of nature and other than in the general course of natural drainage," and the defendants "have, by artificial means, changed the surface drainage of their said lands in such a manner as to bring waters from another watershed into the natural watershed in which the Plaintiff's land is located and [to cast] those waters upon the Plaintiff's

land." The complaint prayed for injunctive and other relief.

The defendants denied these allegations. In 1967 the complaint was amended by adding count II, which named the village of Oreana, a municipal corporation, as a defendant, and alleged that the village approved three plats within the land owned by the original defendants, that "the Defendant subdividers did dedicate the streets and catch basins to the public for use as public highways and for water mains, sewers, and public utilities," that "the streets and catch basins constructed to date in the additions to the Village of Oreana as described above are now and have been since construction thereof conduits for carrying the diverted surface waters" described above, and that the village now had both title and responsibility for the streets and catch basins.

In 1971, plaintiff filed an amended complaint which added the counts that are involved on this appeal. Count III alleged that the defendants, by converting their parcel of farm land into a residential subdivision, had increased both the amount and the rate of surface-water runoff flowing onto the plaintiff's land. Count IV alleged that the village of Oreana, in approving the plats for the subdivision and accepting dedication of the streets, "knew or should have known that the alterations of the course of nature made by said defendant-subdividers would cause water to flow onto plaintiff's land in a greater amount than would normally flow thereon in the course of nature," and prayed for injunctive and other relief against the village.

The amended complaint also contained additional counts relating to alleged damage to a private drainage tile servicing part of plaintiff's land, and to alleged increase in surface-water runoff and introduction of improperly treated sewage attributable to installation of septic tanks on defendants' land and failure to provide a proper means of disposition for sewage. These additional counts, as later amended, were ultimately dismissed by the trial court for

want of proof. Prior to trial the court dismissed counts III and IV for want of an allegation that the water "was directed from its natural source or outlet or flowed other than in the general course of natural drainage." The plaintiff elected to stand on counts III and IV, and the case proceeded to trial before the court on the others. At the conclusion of the trial, the court found that there was no diversion from another watershed, and for that reason entered judgment for the defendants. The appellate court affirmed (9 Ill. App. 3d 828), and we allowed leave to appeal.

In this court the plaintiff challenges only the ruling of the trial court dismissing counts III and IV. The legal question presented is whether the liability of the owner or occupier of a dominant, or higher, estate for damage inflicted upon the servient, or lower, estate by increased surface-water runoff is limited to that caused by diversion from another watershed. This entire area of the law has been characterized by the gradual modification of two "rules," which in their simplest form seem precisely opposed, into working principles that lie in the middle ground between the two polar extremes. The two rules were described this way in Kinyon & McClure, Interferences with Surface Waters, 24 Minn. L. Rev. 891 (1940): "In substance, the civil law rule of surface waters is that a person who interferes with the *natural* flow of surface waters so as to cause an invasion of another's interests in the use and enjoyment of his land is subject to liability to the other." (24 Minn. L. Rev. at 893.) "The 'common enemy' *** rule of surface waters is, in substance, that a possessor of land has an unlimited and unrestricted legal privilege to deal with the surface water on his land as he pleases, regardless of the harm which he may thereby cause to others." 24 Minn. L. Rev. at 898.

In general, the Illinois cases may be said to have followed a modified version of the civil law rule. An early case, *Stout v. McAdams* (1839), 3 Ill. (2 Scam.) 67, 69,

involving riparian rights, suggested the following as a governing principle: "*** and although the act of the one person may be in itself lawful, yet, if in its consequences it necessarily damages the property of another, the party occasioning the damage is liable to make reparation commensurate to the injury he has caused." That thought persisted in *Gillham v. Madison County R.R. Co.* (1869), 49 Ill. 484, said to be the first Illinois case announcing the civil law rule. (Ratcliff, Private Rights Under Illinois Drainage Law, 1960 U. Ill. L.F. 198, 201.) The question squarely raised in *Gillham* was: "[H]as the owner of a servient heritage a right, by embankments or other artificial means, to stop the natural flow of the surface water from the dominant heritage, and thus throw it back upon the latter?" In an opinion by Chief Justice Breese the court rejected "the right of the servient heritage to obstruct the natural flow of surface water," found in the Massachusetts cases, because "[t]he doctrine of these cases wholly ignores that most favored and valuable maxim of the law, *sic utere tuo, ut alienum non laedas,* a maxim lying at the very foundation of good morals, and so preservative of the peace of society." (49 Ill. at 485-86.) And in *Gormley v. Sanford* (1869), 52 Ill. 158, the court in *dicta* indicated an inclination to rely upon the law of watercourses, which has long been essentially one of reasonable use, for analogies in cases of appropriation of surface waters by the owner of a' dominant tract, and a willingness to alter the rule, or abandon it altogether in the case of city lots provided with a reasonable alternative means of drainage.

The first holding modifying the rule came, however, in an agricultural context, in *Hicks v. Silliman* (1879), 93 Ill. 255, and was made explicit in *Peck v. Herrington* (1884), 109 Ill. 611, where the court said:

"*** It may also be regarded as a well settled rule that the owner of the upper field can not construct drains or ditches so as to create new channels for water in the lower field, but he may

make such drains, for agricultural purposes, on his own land, as may be required by good husbandry, although by so doing the flow of water may be increased in a regular, well-defined channel, which carries the water from the upper to the lower field." 109 Ill. at 619.

The "good husbandry" rule—or exception—was embodied in the Drainage Act of 1885, and has survived through codifications and revisions. It presently appears as section 2—1 of the Illinois Drainage Code in the following form: "Land may be drained in the general course of natural drainage by either open or covered drains. When such a drain is entirely upon the land of the owner constructing the drain, he shall not be liable in damages therefor." (Ill. Rev. Stat. 1973, ch. 42, par. 2—1.) At least since 1885, our statutes have provided for the extension of drains through · the land of others, and established a proceeding whereby the proper course of such extensions could be ascertained and damages awarded the landowner whose land was damaged in the process. They have provided for various types of drainage districts to establish and maintain levees, ditches, and underground drains, to be financed by special assessments calculated on the basis of the benefit to be conferred upon each parcel of land served by the district. As these statutes were implemented, the focus of litigation, which had been on private rights of drainage, shifted to the administration of the districts authorized by the act and the fairness of the assessments. In 1953 the General Assembly enacted a statute authorizing the establishment of Surface Water Protection Districts which are authorized to levy taxes and take such action as necessary for the protection of the district from surface-water damage. Ill. Rev. Stat. 1973, ch. 42, pars. 448-471.

The defendants rely heavily on *Fenton and Thompson R.R. Co. v. Adams* (1906), 221 Ill. 201, to support their position that the owner of the dominant estate has an unlimited right to alter the surface-water drainage of his land so long as water is not diverted from another

watershed. We think this reliance is misplaced, and that to the extent that *Adams* is inconsistent with the earlier cases, it should be limited to its facts, which may be gathered from the following language of the opinion:

> "*** As said in *Daum v. Cooper,* [208 Ill. 391], where the proprietor changes the natural course of the water he must restore the water to its natural channel within the limits of his own land. He must not only do that, but he must also see that the water passes from his land upon the land of his neighbor at the precise place where it would naturally do so, and at no other place. ***
> It seems to us, from the evidence contained in this record, that the decree would have been more equitable had it provided that [the proposed ditch be constructed] to a point where it would lead into the natural course within a few feet of the place where that course passes upon the right of way. Had this been done it would have insured the water emptying out of the ditch and passing upon the railroad company's property through the natural channel and just at the opening which the company is required by the decree to leave in its grade. On the trial of the cause, however, defendants offered to construct their proposed ditch to the railroad right of way so that it would lead to and through a culvert to be constructed by the company. This offer ,appellants refused. *** We cannot reverse the decree for the purpose of permitting the appellants to obtain relief which they refused to accept when it was offered them on the original trial in the circuit court." 221 Ill. at 215-16.

From this excerpt, it would appear that one of the parties refused an arrangement which would have resolved the landowners' conflicting claims, and that the court felt justified in extending the *Daum* case, in which the court had noted that there was no ground to believe that the

servient owner would be harmed by the proposed altera-
tion, to the facts before it, where it was clear that the
increased flow would occasion damage, but equally clear
that the servient owner had refused a reasonable compro-
mise. In any event, it appears that the alterations approved
in both the *Daum* and *Adams* cases were to make the land
more suitable for cultivation.

In the present case, it is sufficient to say that our cases
do not support the defendants' contention that they had
an unlimited right to increase the rate or amount of
surface-water runoff flowing onto plaintiff's land, regard-
less of the cause or extent of the increase.

Interference with natural drainage has been limited to
that which was incidental to the reasonable development
of the dominant estate for agricultural purposes. It is
obvious, however, that the natural drainage pattern may be
substantially altered by surface and subsurface changes
which interfere with the natural seepage of water into the
soil of the dominant estate. This kind of change has not
been involved in our cases, but the principle that would
prevent unreasonable changes in the natural lateral drain-
age flow should also apply, in our opinion, to a change
which would unreasonably interfere with drainage through
natural seepage.

The question which must be confronted is whether
the increased flow of surface waters from the land of the
defendants to that of the plaintiff, regardless of whether it
was caused by diversion from another watershed, the
installation of septic tanks, the grading and paving of
streets, or the construction of houses, basements and
appurtenances, was beyond a range consistent with the
policy of reasonableness of use which led initially to the
good-husbandry exception. The judgment of the appellate
court is reversed and the cause remanded to the circuit
court of Macon County for proceedings consistent with
the views here expressed.

*Reversed and remanded.*