GERALD DOVIN et al., Plaintiffs-Appellees, v. WINFIELD TOWNSHIP et al., Defendants-Appellants (Winfield Township et al., Cross-claim Plaintiffs and Cross-Appellants; Lockert's Land Improvement Company et al., Cross-claim Defendants and Cross-Appellees).

Second District Nos. 2—86—1151, 2—86—1169 cons.

Opinion filed December 29, 1987.

Stephen R. Swofford and H. Anne McKee, both of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Thomas Patrick Rice, of counsel), for appellants Winfield Township, Charles Kaelin, and Arthur Lootens.

John Edwin Norton, of O'Reilly, Cunningham, Norton & Mancini, of Wheaton (Thomas R. Weiler, of counsel), for appellant Rempe-Sharpe & Associates, Inc.

Aldo E. Botti, of Botti, Marinaccio, DeSalvo & Pieper, Ltd., of Oak Brook (John N. Pieper, of counsel), for appellees Gerald Dovin and Marie Dovin.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiffs, individual homeowners, sued defendants Winfield Township and two of its officials (Winfield), Rempe-Sharpe & Associates and two of its officers (Rempe-Sharpe), and Lockert's Land Improvement Company (Lockert's), alleging that improvements to a drainage system made by defendants caused the flooding of plaintiffs' property. Plaintiffs alleged trespass, nuisance, and negligence. Winfield filed a cross-claim for contribution or indemnity against defendants Rempe-

Sharpe and Lockert's. All claims against Lockert's were settled prior to trial and it is not a party to these appeals. The indemnity count in the cross-claim was dismissed and the cross-claim was tried on the contribution issue. During the trial, the trial court dismissed the negligence counts at the close of evidence. The remaining counts went to the jury, which returned a verdict on both trespass and nuisance against defendants. The jury also returned a verdict on the contribution count, proportioning damages against Rempe-Sharpe at 55% and Winfield at 45%. Winfield and Rempe-Sharpe filed post-trial motions for judgments notwithstanding the verdict or for a new trial on the trespass and nuisance claims. Winfield also filed a post-trial motion seeking judgment notwithstanding the verdict, reduction of the percentage of fault or a new trial on the contribution count against Rempe-Sharpe. All post-trial motions were denied. Both Winfield and Rempe-Sharpe have appealed, and their appeals have been consolidated. We reverse in part and affirm in part.

The improved drainage system runs along Grove Street in West Chicago, Illinois. Grove Street is an east-west street. The west end of the street intersects with Route 59, a four-lane north-south highway. The east end of the street dead-ends at property owned by Campbell Soup. In between Route 59 and where Grove Street dead-ends, Grove is intersected by Ridgeland Avenue, another residential street. Plaintiffs are all property owners whose land abuts the Campbell Soup property near the east end of Grove Street.

In 1976, Route 59 was widened from a two-lane to a four-lane road. Thereafter defendant, Arthur J. Lootens, the Winfield Township road commissioner, received complaints from homeowners on the west end of Grove Street about flooding of their property. At that time, a portion of Grove Street was unimproved street in that it did not run all the way from Route 59 to its dead end at the Campbell Soup property. Just west of Ridgeland, what is now improved Grove Street, there was almost no ditch at all, and the area was covered with "undergrowth, scrub trees, [and] bushes." Lootens approached Charles Kaelin, supervisor of Winfield Township, about this problem. Kaelin went out to the site and observed standing water on the property of the first two homes on the north side of Grove Street, just east of Route 59. After Lootens and Kaelin discussed the problem, Kaelin retained Rempe-Sharpe to make drainage improvements on Grove Street. Rempe-Sharpe designed the Grove Street project, supervised the construction, and completed the project in the fall of 1977.

Construction of the Grove Street project involved excavating a ditch on the north side of Grove Street and installing new culverts be-

neath the driveways. The pipes were increased in size from 12 x 15 inches to 22 x 36 inches. The Grove Street project improvements were installed in the same place as the existing structures. The project extended the existing structure and started west of the first residence east of Route 59. Grove Street was also improved by continuing it through to connect with Ridgeland Avenue.

About midway through the project, Rempe-Sharpe and Winfield met with the representatives of the Campbell Soup Company. Campbell Soup was concerned that the project would increase the amount of water deposited on its property. In response to these concerns, Rempe-Sharpe installed restrictors narrowing the diameter of the culverts. The restrictors were installed in October or November 1977 and reduced the opening to 18 inches. The purpose of the restrictors was to make drainage approximately as it had been before.

At trial, Dr. Harry Wenzel was called to testify as an expert on behalf of plaintiffs. Wenzel testified that after the project, the ditches and culverts were considerably larger than they were originally. Under high flow conditions more water would be stored and more water would eventually pass through the culvert and move down Grove Street toward Campbell Soup's property. The cross-sectional area of the ditch after the project was approximately five to six times as great as the cross-sectional area of the ditch before the project. After the project, the water is in essence stored in the ditch instead of flowing overland on its original drainage path that he had described, and the water could now flow through the culvert under Ridgeland and down Grove toward the east. Prior to the project the water would also have drained that way, but the volume would have been less. Wenzel did not believe that the placement of restrictors at Ridgeland and Grove or further down on Grove Street would change his opinion.

Extensive testimony was also given by plaintiffs concerning flooding which occurred after completion of the Grove Street project. Such testimony will be developed as necessary.

At the close of trial, the jury returned verdicts totaling $35,950 for the plaintiffs and against both Winfield and Rempe-Sharpe. The jury also returned a verdict on Winfield's contribution count against defendant Rempe-Sharpe, assessing Winfield's fault at 45% and Rempe-Sharpe's at 55%.

I

■■ Rempe-Sharpe first contends that the jury was not properly instructed on the issue of intentional trespass. Rempe-Sharpe argues that a proper instruction for trespass would have stated:

"That the defendants designed the drainage improvements along Grove Street *with the knowledge that the improvements would, to a substantial certainty,* result in the diversion of water onto plaintiffs' properties \*\*\*." (Emphasis added.)

In response, plaintiffs contend that the instruction given by the trial court favorably compares to the language approved in *Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548. We agree.

In *Dial,* the court adopted Restatement (Second) of Torts. (81 Ill. 2d at 555.) The court stated:

"According to the Restatement, a person may be liable for an intentional intrusion on land for directly casting an object upon the property of another or for indirectly causing the intrusion if an act is done with knowledge that it will, *to a substantial certainty,* result in the entry of the foreign matter." 81 Ill. 2d at 554, citing Restatement (Second) of Torts §158, comment *i,* at 278-79 (1965).

In the present case, the jury was instructed that it must find that "defendant *knew or was substantially certain* that the Grove Street project would result in the invasion of the plaintiffs' property by altering the flow of water in one or more of the ways stated to you in these instructions." (Emphasis added.)

While defendants' proffered instruction states the law in accordance with *Dial,* the instruction given by the trial court does not have a substantially different meaning from the language cited in *Dial.* Consequently, we hold that the trial court did not commit prejudicial error in rejecting defendants' proffered instruction.

## II

Citing *Woods v. Khan* (1981), 95 Ill. App. 3d 1087, Rempe-Sharpe next contends that the instruction on the burden of proof on the issue of intentional nuisance was incorrect in that the instruction should have defined "unreasonable interference." In response, plaintiffs contend that the instruction given by the trial court substantially followed *Woods.*

Although both parties have focused their contentions on the law as it relates to nuisance, the issue of instructions cannot be properly resolved without examining the law that has developed regarding the drainage of surface water.

■ In dealing with the drainage of surface water, our courts originally applied what is known as the "civil rule." Under this rule, the owner of higher (dominant) land has a natural easement in lower (servient) land to allow the surface water to flow naturally off the dominant estate and onto the servient estate. (*Pinkstaff v. Steffy* (1905),

216 Ill. 406, 411; *Peck v. Herrington* (1884), 109 Ill. 611, 619; *Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 22.) The justification for this rule is that nature has ordained such drainage, and it is natural justice that rights of individual owners should follow the laws of nature. (*Gormley v. Sanford* (1869), 52 Ill. 158, 162.) However, under this rule the owner of the servient estate was not obligated to receive surface water in different quantities or at different times than would naturally come to his land. *Mellor v. Pilgrim* (1878), 3 Ill. App. 476, 480.

The civil rule has been modified in this State by what has come to be known as the "good husbandry" exception. (*Templeton v. Huss* (1974), 57 Ill. 2d 134, 138-39.) In the first case to adopt this exception, *Hicks v. Silliman* (1879), 93 Ill. 255, our supreme court stated:

"While the owner of land may use it as he pleases for habitation and other lawful purposes, yet his right in this respect is subject to the qualification that he must so use it as to not inflict an injury upon his neighbor.

By the term injury here we have no reference to those slight inconveniences that often occur by the ordinary and legitimate use of land, but we have reference to those palpable and substantial injuries which are not sanctioned by usage and do not result from the ordinary use and enjoyment of one's own property. So, while it is perfectly proper for the owner of land to use and cultivate it according to the ordinary methods of good husbandry, although by doing so it may interfere with the natural flow of surface water in passing over his own land, so as to increase or diminish the amount that would otherwise reach the land of an adjacent proprietor and thereby cause him an injury for which the law would afford no redress, yet such owner has no right, by the construction of ditches and embankments or other artificial structures of a similar character, to collect together the surface waters from his own lands or those of other persons, and precipitate them in undue and unnatural quantities upon the lands of his neighbor to his injury." 93 Ill. at 264.

The "good husbandry" exception being developed for agricultural purposes does not strictly apply to urban and suburban settings such as the one involved in the present case. (See *Templeton*, 57 Ill. 2d at 141 ("Interference with natural drainage has been limited to that which was incidental to the reasonable development of the dominant estate *for agricultural purposes*." (Emphasis added)).) However, in *Templeton*, our supreme court made it clear that for urban settings the civil rule is not applied unmodified:

"The question which must be confronted is whether the increased flow of surface waters from the land of the defendants to that of the plaintiff *** was beyond a range consistent with the policy of reasonableness of use which led initially to the good-husbandry exception." 57 Ill. 2d at 141.

While the focus of the "good husbandry" exception appears to be solely upon the dominant estate and whether the increased flow of water is due to reasonable development of the dominant estate, we find that a similar focus for cases dealing with urban and suburban areas is inappropriate. The better rule for such areas is to balance the benefit of the drainage against the harm caused by such drainage.

Both urban and suburban settings contain highly and densely developed real estate which may be in a servient position to other real estate. Because such servient land may be highly developed, the potential for economic loss that would occur due to an increase in the flow of water onto such land is great, and consequently should not be disregarded, as would happen if the focus were solely on the dominant estate. Likewise, the good that can come from developing real estate in a dominant position should not be disregarded, as would happen if the focus were solely on the servient estate. This being the case, the natural conclusion is that the benefit to the dominant estate should be balanced against the harm caused to the servient estate. We are also persuaded that a balancing test is appropriate because it comports with the law of nuisance as it exists in this State (see *Woods*, 95 Ill. App. 3d at 1090) and would follow the Restatement of Torts' handling of drainage of surface waters (see Restatement (Second) of Torts §833 (1979) ("An invasion of one's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water may constitute a nuisance under the rules stated in §§821A-831."); see also *McGlashan v. Spade Rockledge Terrace Condo Development Corp.* (1980), 62 Ohio St. 2d 55, 60-61, 402 N.E.2d 1196, 1200; *Enderson v. Kelehan* (1948), 226 Minn. 163, 166-67, 32 N.W.2d 286, 289). And, as stated by the Restatement, there is no reason to distinguish damage done from water from other types of nuisance—the damage is the same, only the cause is different. (Restatement (Second) of Torts §833, comment *b* (1979).) Finally, such a test also parallels the law as it relates to subterranean water rights, where the legislature has adopted a reasonable use test. See Ill. Rev. Stat. 1985, ch. 5, par. 1606.

■ Consequently, in accordance with the above discussion, we conclude that the appropriate method of determining whether there is a compensable injury due to an increased flow of water is to deter-

mine whether such increased flow is reasonable by balancing the benefit to the dominant estate against the harm done to the servient estate.

■■ In applying a balancing test to determine reasonableness in the present case, we find that the trial court did not err in instructing the jury. To determine whether the interference in the present case was unreasonable, the trial court instructed the jury as follows:

"You are to decide whether there was an interference that was unreasonable by *weighing the gravity of harm, if any, done to plaintiff against the usefulness and suitability of the Grove Street project* by considering the following factors:

(a) the extent of the harm involved;
(b) the character of the harm involved;
(c) the social value attached to the type of use or enjoyment interfered with;
(d) the suitability of the particular use or enjoyment invaded by the character of the locality;
(e) the burden on the person harmed of avoiding harm; and
(f) the usefulness of the Grove Street project.

The weight to be given by you to any of the above factors is for you to determine." (Emphasis added.)

Thus, the instruction given by the trial court substantially followed the balancing test adopted in this opinion. Consequently, this court holds that the trial court did not err in instructing the jury on this issue.

### III

Winfield contends that a judgment notwithstanding the verdict should have been entered in favor of Winfield because the evidence failed to show intent. Specifically, Winfield argues that Winfield wanted Rempe-Sharpe to get rid of the water and did not know where it was going to be sent. Winfield further argues that evidence that established the defendants "should have known" is not sufficient because that would only prove negligence. Finally, Winfield argues that Rempe-Sharpe's knowledge cannot be imputed to Winfield as a matter of law.

In response, plaintiffs contend that all the evidence taken as a whole demonstrated the required intent.

■■ A judgment notwithstanding the verdict should be entered only when all the evidence, viewed in a light most favorable to the opposing party, so overwhelmingly favors the moving party that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.*

(1967), 37 Ill. 2d 494, 510.) In the present case, the jury was instructed that the plaintiff had the burden to prove that:

"Defendant knew or was substantially certain that the Grove Street project would result in the invasion of the plaintiffs' property by altering the flow of water in one or more of the ways stated to you in these instructions."

The state of mind of a party may be proved by circumstantial evidence. (*Rowlett v. Hamann* (1969), 112 Ill. App. 2d 121, 125.) And, circumstantial evidence may contradict direct evidence and may be accepted by the trier of fact over direct evidence. (See *Kosch v. Monroe* (1982), 104 Ill. App. 3d 1085, 1091.) Furthermore, a jury is permitted to draw upon their own observations and experiences in the affairs of life. Illinois Pattern Jury Instructions, Civil, No. 1.04 (2d ed. 1971).

In the present case, we find that there was enough circumstantial evidence to show that Winfield knew that water would flow onto plaintiffs' land and cause flooding. Prior to the project, Lootens observed water standing six inches deep at the end of Grove Street where it ended in a forest. This water extended from the end of Grove Street to Ridgeland. The drainage system through the forested section of Grove Street was barely visible whereas, after the project, the ditch along Grove Street between Route 59 and Ridgeland was from three to four feet deep. Lootens had experience as a local road commissioner for 20 years and was an excavating contractor prior to that time. In both capacities, Lootens was called upon to improve and maintain drainage ditches and drainage paths, thereby providing him with a degree of experience in matters of drainage that an ordinary person might not have. Kaelin was familiar with the lay of the land and knew that the property at the end of Grove Street east of Ridgeland was lower than the surrounding land. Kaelin knew that water naturally accumulated at the end of Grove Street and its terminus with the Campbell Soup property. Kaelin saw water standing three to four feet deep up against a garage located on the north side of Grove Street just east of Route 59 prior to the commencement of the Grove Street project. Winfield relied on Rempe-Sharpe's plans and had no objections to these plans. Gerald Dovin testified that the unimproved section of Grove Street had a slight slope to the south such that if there was any water, the water would drain to the south.

Consequently, the evidence showed that there was water at the east end of Grove Street which Winfield wanted drained away. Furthermore, the jury was entitled to conclude that, from Winfield's knowledge of Rempe-Sharpe's plans, Winfield knew where the ditches

were going to be dug by Rempe-Sharpe and where the water would go. The plans show that the new ditches slope toward plaintiffs' property and also show the depth of the new ditches. Finally, it is self-evident that if there is water in an area of higher ground and a trench is dug to divert that water, the water will follow the path of that trench. In the present case, the trench led to the end of Grove Street where plaintiffs' property was and where the Campbell Soup property was. The evidence further adduced that Winfield, through Kaelin, was aware that flooding occurred on the Campbell Soup property. The addition of more water to that area could have only caused more flooding.

In light of all this evidence, the jury could have concluded that Winfield knew that flooding would occur through its actions. Therefore, we find that the verdict was not against the manifest weight of the evidence.

IV

Both Winfield and Rempe-Sharpe contend that the verdicts were against the manifest weight of the evidence in that the evidence did not show they had the intent to divert waters to flood the plaintiffs' properties. Additionally, Rempe-Sharpe argues that the verdicts were against the manifest weight of the evidence because the evidence showed that flooding occurred on plaintiffs' property prior to the Grove Street project.

■ A judgment will be reversed on appeal if it is manifestly against the weight of the evidence. "The manifest weight of the evidence is that which is 'the clearly evident, plain and indisputable weight of the evidence.' [Citation.] In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent." *In re Application of County Collector* (1978), 59 Ill. App. 3d 494, 499.

■ ■ In accordance with the above discussion concerning Winfield's argument for a judgment notwithstanding the verdict, it is apparent that the jury verdicts against Winfield were not against the manifest weight of the evidence in showing intent. Likewise, because Rempe-Sharpe designed the project, the verdicts against Rempe-Sharpe were not against the manifest weight of the evidence in showing intent since it too knew where the water would be diverted.

■ ■ With respect to whether the Grove Street project actually contributed more water to plaintiffs' land than would have flowed there under the same weather conditions prior to the project, the verdict was not against the manifest weight of the evidence. Although

Rempe-Sharpe argues that there was evidence which showed water accumulated in the same way prior to the project, a close examination of the exhibits and the testimony reveals that the Grove Street project exacerbated any problem that already existed. Defendant's exhibit number 16 shows that water covered the first rail of a fence on the northeast corner of Judy Dorko's property in 1972. From a review of all the evidence, this appears to be the highest point that the water reached in 1972. Comparing this level of water to that reached in 1978 and 1979, Dorko testified that in 1979 the water covered the fence and covered a barrel shown in plaintiff's exhibits numbers 69 and 72. Furthermore, she estimated the depth of the water in 1979 to be from four to five feet, which would also be higher than the water shown in defendant's exhibit number 16. Therefore, we find that the jury's verdict was not against the manifest weight of the evidence.

## V

Rempe-Sharpe contends that to prove their case for intentional trespass, plaintiffs must present evidence of the natural course of drainage prior to construction and show by competent proof that the water course after the construction was not in the natural course of the drainage. Rempe-Sharpe also argues that it is well settled in this State that the owner of a dominant parcel of property may increase the amount of water drained from his property, so long as it is "drained into the natural and usual water course as may be required by what has been referred to in the case as 'good husbandry.' "

We find this argument to be without merit. In order to prove trespass one need not show that the course of water has been changed, but rather that the course of water was changed or the flow increased. (See *Templeton v. Huss* (1974), 57 Ill. 2d 134, 139-40.) Rempe-Sharpe is also incorrect in asserting that the owner of a dominant estate has an unlimited right to increase the amount of water drained from his property. As discussed previously, the proper determination is whether the benefit to the dominant estate outweighs the harm done to the servient estate.

## VI

Winfield contends that the trial court committed reversible error in refusing to submit to the jury Winfield's special interrogatories numbers 60 and 61 on the issue of intent. In response, plaintiffs contend that the interrogatories were properly refused because the form of the interrogatory was different from the instructions and thus could confuse the jury. Plaintiffs also contend that the interrogatories

were not phrased properly because the names of defendants were in the conjunctive.

 Section 2—1108 of the Code of Civil Procedure states in pertinent part:

> "The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1108.)

This provision of section 2—1108 is mandatory and the court has no discretion to refuse the request if it is on a material ultimate fact. *Ott v. Burlington Northern R.R. Co.* (1986), 140 Ill. App. 3d 277, 282.

 Winfield's interrogatory number 60 read as follows:

> "Did the defendants, Winfield Township, Charles Kaelin, in his official capacity as supervisor of Winfield Township, and Arthur J. Lootens, in his official capacity of commissioner of highways, know or known [*sic*] to a substantial certainty that the Grove Street project would result in the deposit of water on the property of the plaintiff, Patrick and Margaret Ryan, that would not have been deposited there under similar weather conditions prior to the Grove Street project?"

(We note that for purposes of this discussion, Winfield's special interrogatory number 61 is substantially the same as number 60.) Although plaintiffs argue that Winfield's special interrogatories would have confused the jury because it used the term "know or know to a substantial certainty," we find that no such confusion would have occurred.

 However, plaintiffs also argue that the interrogatories were in the conjunctive. A question for a special finding should be single and direct. (*Illinois Steel Co. v. Mann* (1902), 197 Ill. 186, 189; *Erickson v. Aetna Life & Casualty Co.* (1984), 127 Ill. App. 3d 753, 766.) In the present case, the interrogatories asked whether defendants Winfield Township, Charles Kaelin, *and* Arthur Lootens knew or knew to a substantial certainty that the Grove Street project would result in an increase in the amount of water deposited on the property of plaintiff. Consequently, to give an affirmative answer, the jury would have to find that all three of the named defendants knew that the Grove Street project would increase the amount of water deposited on plaintiffs' land. Although it might have been necessary to find that either

Kaelin or Lootens knew that the project would increase water on plaintiffs' land in order to find that Winfield knew that the project would increase water on plaintiffs' land, it would not have been necessary for the jury to find that both Kaelin and Lootens had the knowledge in order to find Winfield liable. Therefore, this court finds that the trial court did not err in refusing Winfield's special interrogatories numbers 60 and 61.

## VII

■ Both Winfield and Rempe-Sharpe contend that the instructions on damages for trespass and nuisance allowed plaintiffs double recovery of damages. A plaintiff shall have only one satisfaction for an injury irrespective of the availability of multiple theories that recovery for injury can be sought under. *Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548, 558.

■ In the present case, the instruction for damages on trespass stated:

"If you find for plaintiff and against defendant on trespass, you must award damages to plaintiff for interference with plaintiff's right to exclusive possession of plaintiff's land, even though you also find plaintiffs have suffered no other damages.

Additionally, you must fix the amount of money which will reasonably and fairly compensate plaintiff for any of the following elements of damage proved by the evidence to have resulted from the conduct of defendant:

Replacement and/or value of property which was damaged or lost.

Whether any of these additional elements of damage has been proved by evidence is for you to determine."

The instruction for damages with regard to nuisance stated:

"If you find for plaintiff and against defendant on nuisance, you must also fix the amount of money which will reasonably and fairly compensate plaintiff for any of the following elements of damage proven by the evidence to have resulted from the conduct of defendant: (1) loss of use of land (2) discomfort, annoyance and/or inconvenience to plaintiff as an occupant of land.

Whether any of these elements of damage has been proved by the evidence is for you to determine."

"[I]nterference with plaintiff's right to exclusive possession of plaintiff's land" and "loss of use of land" appear to be the same thing. Therefore, the instructions allow for a double recovery as to this par-

ticular injury. The two instructions do, however, contain elements not contained in the other. The instruction for trespass allows for "replacement and/or value of property which was damaged or lost," and the instruction on nuisance allows for "discomfort, annoyance and/or inconvenience to plaintiff as an occupant of land." However, while there was evidence that plaintiffs incurred property damage, there was no testimony which purported to give a dollar value to this damage. Therefore, we conclude that there was no evidence to support the second half of the instruction for damages due to trespass. (See *Vandermyde v. Chicago Transit Authority* (1979), 73 Ill. App. 3d 984, 994 (extent of damages requires that a monetary value be established).) This being the case, we reverse the damages on trespass and affirm the damages for nuisance.

## VIII

Finally, Winfield contends that it is entitled to a judgment notwithstanding the verdict, a reduction of its percentage of fault, or a new trial on its contribution claim against Rempe-Sharpe. Winfield argues that Rempe-Sharpe designed the project, supervised the construction and approved the work, and that Winfield had nothing to do with these activities. Winfield thus argues that assuming that Winfield has any liability at all, it is entitled to 100% contribution, or at least a percentage of contribution far exceeding the 55% on which judgment was entered.

■■ Winfield compares this case with cases in which "active-passive" indemnity was traditionally awarded. However, our supreme court has stated that, "[a]ctive-passive indemnity is no longer a viable doctrine for shifting the entire cost of tortious conduct from one tortfeasor to another." *Allison v. Shell Oil Co.* (1986), 113 Ill. 2d 26, 35.

■■ Though Winfield tries to distinguish its responsibility from that of Rempe-Sharpe's, it nevertheless has been found liable of two intentional torts. Whereas Winfield would have this court believe that it had virtually no involvement in the Grove Street project, the jury found otherwise and such verdict is not against the manifest weight of the evidence. We also find that the jury's percentage of allocation for the injury was not against the manifest weight of the evidence. This is not a case where one defendant has hired another defendant to do a job and the defendant that is employed has done it wrongfully or negligently. Rather, it is a case where Rempe-Sharpe designed the Grove Street project in accordance with Winfield's desires and Winfield approved such a plan.

Although the parties have not raised the issue, we consider

whether or not the Contribution Act (Ill. Rev. Stat. 1985, ch. 70, par. 301 *et seq.*) applies to cases involving intentional torts.

Prior to enactment of the Contribution Act, our supreme court first adopted contribution in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1. In *Skinner*, the court reviewed the history of contribution and in so doing recognized that the bar to contribution originally applied only to intentional torts. (70 Ill. 2d at 8, 10.) While the court made this observation, it did not specifically address whether contribution would be applicable in future cases involving intentional torts. However, in his dissenting opinion Justice Ward stated:

> "Finally, the majority's review of *Merryweather v. Nixan* (1799), 101 Eng. Rep. 1337, 8 Term R. 186, and of some of this court's decisions suggest that the rule against contribution between joint tortfeasors where the tort was one of intentional misconduct or of concerted action has not been disturbed, but the opinion does not make an explicit pronouncement to this effect. Torts of this character do not come within the rationale of the doctrine of contribution, and the rule denying contribution in that situation should be preserved. I would state clearly that it is being retained." 70 Ill. 2d at 19 (Ward, J., dissenting).

In interpreting the Contribution Act the Appellate Court for the First District found that the Contribution Act was meant to be a codification of *Skinner* and that *Skinner* did not extend contribution to intentional torts. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 456.) Consequently, the First District has held that the Contribution Act does not apply to intentional torts. (150 Ill. App. 3d at 456.) On the other hand, the Appellate Court for the Fifth District held that where a party sought contribution was responsible for willful and wanton conduct, a verdict assessing 10% contribution against another party was proper where that party's conduct also caused damage. *Pipes v. American Logging Tool Corp.* (1985), 139 Ill. App. 3d 269, 274.

■■ Despite the historical prohibition against the application of contribution to intentional torts, we find that the present Contribution Act does apply contribution to intentional torts. In interpreting any legislation, a court must begin by examining the text of the statute itself. (*People ex rel. Gibson v. Cannon* (1976), 65 Ill. 2d 366, 369.) If the language in the act is plain and unambiguous it is the duty of the court to enforce the statute as enacted. (65 Ill. 2d at 369.) The Contribution Act provides:

> "Except as otherwise provided in this Act, where 2 or more

persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them." (Ill. Rev. Stat. 1985, ch. 70, par. 302.)

The Contribution Act on its face does not limit itself to unintentional torts. The word "tort" by itself includes intentional as well as unintentional torts. (See *Judson v. Peoples Bank & Trust Co.* (1954), 17 N.J. 67, 89, 110 A.2d 24, 35.) Furthermore, the Contribution Act was adopted after *Skinner*. This is significant due to the fact that *Skinner* discussed the historical bar to contribution for intentional torts and because Justice Ward went even further and addressed the issue of whether contribution could be applied to intentional torts under *Skinner*. Consequently, it must be concluded that the legislature was fully aware of the issue when it adopted the Contribution Act. Yet, being aware of the issue, the legislature did not use the term "unintentional torts" or even "negligence." Instead, the legislature used the term "tort." We therefore conclude that the Contribution Act is applicable to intentional torts. Consequently, we affirm the jury's judgment relating to contribution.

In accordance with the foregoing discussion on the issues, we reverse the damages award for trespass and affirm on all other issues.

Affirmed in part and reversed in part.

LINDBERG, P.J., and REINHARD, J., concur.