EDWARD H. DESSEN *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. JIMMIE JONES, Defendant-Appellant and Cross-Appellee.

Fourth District   No. 4—89—0403

Opinion filed February 28, 1990.

Lawrence E. Johnson, of Lawrence E. Johnson & Associates, P.C., of Champaign, for appellant.

Mary A. Perlstein, of Dobbins, Fraker, Tennant, Joy & Perlstein, P.C., of Champaign, for appellees.

JUSTICE GREEN delivered the opinion of the court:

On April 22, 1988, plaintiffs Edward H. Dessen and Loretta Dessen filed suit in the circuit court of Champaign County against defendant Jimmie Jones seeking temporary and permanent injunctive relief in regard to the alleged infringement by defendant of plaintiffs' rights as dominant owners to have water flow from their land through that of defendant, a servient land's owner. Compensatory damages were also requested. The dispute arose because defendant had filled portions of his land with dirt. On May 6, 1988, the court preliminarily enjoined defendant from spreading more dirt over his land. An amended and second-amended complaint were filed, and Knowlton and Bennett, Inc. (Knowlton), a corporation of which plaintiffs were the sole shareholders, was added as a party plaintiff requesting the same relief. Compensatory damages were also requested for an alleged trespass by defendant on plaintiffs' land resulting in the destruction of some trees.

The case was tried at bench with hearings held on several separate dates. On April 18, 1989, the court entered an order in favor of the Dessen plaintiffs and against defendant and in favor of defendant and against the plaintiff Knowlton. The order permanently enjoined defendant from obstructing the flow of water from the Dessens' land through swales on defendant's land and required defendant to restore the swales to the condition existing before he placed dirt on them. The plaintiffs were awarded damages of $518.17 for defendant's trespass. Defendant has appealed and Knowlton has cross-appealed the finding against it.

Defendant maintains (1) the Dessens were not proper parties to seek injunctive relief; (2) the evidence did not support the issuance of

any injunctive relief, particularly a mandatory injunction; (3) the circuit court failed to balance the equities between the Dessens and defendant; (4) the terms of the mandatory injunction were too vague; and (5) the court erred in awarding compensatory damages for the destruction of trees. Plaintiff Knowlton maintains it had an interest in the property entitling it to relief. We affirm every aspect of the order on appeal except we vacate the portion of the order providing for a mandatory injunction and remand to the circuit court with directions to make the terms of the mandatory injunction more definite and certain.

■ We can dispose of the last issue raised by defendant most easily. The evidence is undisputed that in clearing his tract, defendant destroyed at least two live Osage orange trees upon plaintiffs' land. An expert witness testified that replacements could be obtained without cost and the cost of replanting them would be approximately $75 to $150 each. Plaintiffs presented the testimony of an expert who assumed some seven trees had been destroyed and testified to a replacement cost of approximately $3,500 plus installation cost for those trees. The determination of the circuit court was well within the range of testimony and will be accepted in the absence of showing the decision resulted from passion or prejudice. *Stein v. Spainhour* (1988), 167 Ill. App. 3d 555, 561, 521 N.E.2d 641, 644.

Defendant's assertion the Dessens lacked standing to sue and the contention of Knowlton on cross-appeal are closely related and should be considered together. These issues arise because the dominant estate consisted of a tract which the Dessens entered into a contract to purchase in 1978 upon periodic payments which have not been completed. Thus, they do not have legal title but, upon execution of the contract, they became equitable owners and have power to sue to protect their land. (*Rosewood Corp. v. Fisher* (1970), 46 Ill. 2d 249, 263 N.E.2d 833.) However, the evidence showed that in some ways the Dessens had treated the property as belonging to their wholly owned corporation, Knowlton, though, as the parties have stipulated, no written assignment to that corporation has been made. Knowlton has entered into a lease with a tenant that occupies a building on the tract under a written lease which is not definite as to whether it covers merely the portion containing the building or the entire tract. The corporation receives the rental income, which it reports for income tax purposes. The corporation also takes an income tax deduction for depreciation on the building.

Defendant maintains the evidence conclusively shows that the Dessens had assigned their interest in the contract for sale of the

tract to Knowlton and thus had no standing to sue. He asserts that in attempting to sue, they are seeking to avoid the existence of the corporate entity in which they are the only shareholders while, when it is to their advantage, for business and tax purposes, they treat the corporate entity as the owner of the tract. Such a procedure was frowned upon in *Bevelheimer v. Gierach* (1975), 33 Ill. App. 3d 988, 339 N.E.2d 299. The circuit court found an assignment of the equitable interest in the portion of the property containing the building had been made to Knowlton, but the Dessens retained equitable ownership in the remainder of the tract. That court then found the building had not been damaged by any flooding which had taken place and dismissed the complaint as to plaintiff Knowlton. The court then awarded injunctive relief solely to the Dessens.

■ We recognize this case differs from *Bevelheimer*. There, a plaintiff who had assigned a tenant's interest in a lease to a solely owned corporation and later joined with the corporation in bringing suit against a lawyer for a malpractice in failing to perfect an extension of the lease. The trial court allowed recovery for both the individual and the corporation. The appellate court reversed as to the individual, saying he had no standing to sue because he had assigned all his rights in the lease. Here, no double recovery was sought or granted. The corporation joined in the suit only after an issue was raised as to who had a right to sue. Defendant's only claim of prejudice by the existence of both the individual and corporate plaintiffs is a technical one. He asserts that if the Dessens have no standing, no injunctive relief could have been granted properly to any plaintiff because Knowlton put on no evidence and did not formally adopt the evidence presented by the parties. His theory is that a party can recover only on the basis of the evidence produced by that party. However, the crucial evidence here was admitted generally. The usual rule is that such evidence may be used by any party. (*Morris v. Central West Casualty Co.* (1932), 351 Ill. 40, 183 N.E.2d 595; *Dudanas v. Plate* (1976), 44 Ill. App. 3d 901, 358 N.E.2d 1171.) Defendant was not prejudiced by the fact that both the shareholders of the corporation sued as individuals and the corporation also sued.

The parties agreed that no written assignment was made. However, the lack of a written assignment does not automatically assume that the Dessens had an interest in the premises which would give them standing to sue. The evidence concerning the relationship between the Dessens and Knowlton in regard to the whole tract was uncertain. Accordingly, the circuit court's decision that no assignment had been made of the Dessens' equitable interest in the portion of

the premises, excluding that upon which the building lies, is not contrary to the manifest weight of the evidence.

■ Conversely, as we will explain, the court could properly have determined the portion of the tract upon which the building lies was not damaged by any actions of defendant. Thus, we hold the court did not err either in dismissing the portion of the complaint brought by Knowlton, or by finding the Dessens had standing to sue. We need not decide whether the court could properly find Knowlton an assignee of the Dessens' interest in the part of the land which contained the building.

The heart of the case concerns the sufficiency of the evidence to support the injunctive relief granted. The suit involves three tracts lying on the west side of U.S. Route 45 north of Urbana and just north of the intersection of Route 45 and Interstate 74. All are bound on the west with a frontage road to Route 45. The Dessens' property is the most northerly and defendant's the most southerly. The eastern portions of these two tracts adjoin each other, but a tract belonging to Loren Ellsworth, who is not a party to the case, lies between the western portion of the two tracts, the portion of the two tracts with which we are concerned. Dirt was scraped from the eastern area in the 1940's for use on widening Route 45. The general flow of water has been in a southeasterly direction.

As indicated, the Dessens entered into the contract to purchase some 12 years ago. Edward Dessen testified he has been familiar with that tract since 18 years before the purchase. According to Edward Dessen's testimony, in times of heavy rains, a large volume of water has flowed from the north across the driveway of the building on his tract and then southerly and southeasterly through swales on the Ellsworth property and the Jones' property. He further testified he had installed some drainage tile and a sump pump near the building to help alleviate the problems in that area. The defendant purchased his tract in the fall of 1987. According to defendant's testimony, his tract was a swamp which could not be used without filling. The evidence is undisputed that shortly after coming into possession, defendant hauled in dirt and placed it upon his land and some on the Ellsworth land. Defendant testified he dumped 12 loads of dirt, while Edward Dessen estimated 50 to 75 loads were dumped on the site. The circuit court indicated the testimony of defendant appeared to be more accurate.

Edward Dessen testified that in the spring of 1988, after defendant had dumped dirt on his and the Ellsworth tract, two moderate rains caused water to back up upon his tract, creating a larger area

of ponding than ever before and standing for almost a week. Dessen further testified that the dumped dirt filled swales on the tracts of defendant and Ellsworth that had existed throughout the 30 years he had knowledge of the most northerly of the three tracts. Dessen's testimony was supported by that of Thomas Berns, a registered professional engineer and surveyor who had been hired by Dessen as an expert witness. The substance of Berns' testimony was that swales on the Ellsworth tract and that of defendant in the area described by Dessen had been in existence for over 30 years, carried off water coming from the Dessen tract and had been obstructed by the dirt dumped by defendant. Berns based his opinion in regard to the prior existence of the swales upon geological surveys and aerial photographs of the area which he had studied.

■ Defendant countered with the testimony of Charles S. Danner, also a professional engineer. Danner testified he had walked the area encompassed by the three tracts in 1979 and did not see swales on the land, which he found later to exist when walking the area a few months before his testimony. The court chose to find the testimony of Berns more persuasive than that of Danner. While Danner testified from personal observation and Berns testified as to prior conditions based on interpretation of various documents, Berns' testimony was consistent with that of Dessen. The circuit court's interpretation of the evidence was supportable.

A comprehensive opinion by Justice Harrison of the Fifth District Appellate Court in *Mileur v. McBride* (1986), 147 Ill. App. 3d 755, 498 N.E.2d 581, is very instructive as to much of the law applicable to this case. There, as here, the rights of an owner of higher, dominant land, to continue to discharge water in the natural course of drainage over lower, servient land, were involved. In *Mileur*, the dominant owner sought monetary damages from the servient owner for obstruction of the flow of that water resulting from the servient owner's actions in raising the level of his land. The appellate court reversed a circuit court judgment which had dismissed the complaint for failure to state a cause of action.

The *Mileur* court explained that Illinois follows the civil law rule of surface-water drainage, which provides that when tracts are situated

"such that surface water falling or coming onto one naturally descends upon the other, the owner of the higher (dominant) land has a natural easement in the lower (servient) tract to allow the surface water to flow naturally off the dominant land upon or over the servient land. (*Pinkstaff v. Steffy* (1905), 216

Ill. 406, 411-12, 75 N.E. 163; *Peck v. Herrington* (1884), 109 Ill. 611, 619; *Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 22, 414 N.E.2d 865, 869.) Correspondingly, the owner of the servient land ' "must suffer the water to be discharged upon his land and has no right to stop or impede the natural flow of the surface water." ' (*Geis v. Rohrer* (1957), 12 Ill. 2d 133, 136, 145 N.E.2d 596 quoting *Gough v. Goble* (1954), 2 Ill. 2d 577, 580, 119 N.E.2d 252.) The *servient owner 'cannot, by an embankment or other artificial means, obstruct the water in its natural flow, and thus throw it back upon the upper proprietor.' Gillham v. Madison County R.R. Co.* (1869), 49 Ill. 484, 487." (Emphasis added.) *Mileur*, 147 Ill. App. 3d at 758, 498 N.E.2d at 583.

The *Mileur* court explained that two exceptions exist to the civil law rule of surface-water drainage. One is applicable to railroads and thus clearly not applicable here. (*Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 414 N.E.2d 865.) The other is the so-called "good husbandry" rule, which permits the owner of dominant agricultural land to increase or alter the flow of water upon a servient estate if this is required for proper husbandry of the dominant land. (*Peck v. Herrington* (1884), 109 Ill. 611.) The Mileur court pointed out that in *Templeton v. Huss* (1974), 57 Ill. 2d 134, 311 N.E.2d 141, the supreme court held that whether in an agricultural or urban setting, no rule of law permitted a dominant owner to unreasonably increase the flow of water upon a servient estate. The *Mileur* court concluded no precedent existed in this State for a rule which would permit a servient owner to obstruct the proper flow from a dominant estate in order to make a reasonable use of the servient estate.

■ Further instruction is given us by an equally comprehensive opinion of Justice Inglis of the Second District Appellate Court in *Dovin v. Winfield Township* (1987), 164 Ill. App. 3d 326, 517 N.E.2d 1119. There, the circuit court had entered judgment on a jury verdict which awarded damages for trespass against a township and a contractor which had altered a road in such a way as to change the course and amount of water discharging upon servient land. In affirming, the appellate court recognized that the dominant land had the benefit of a reasonable-use rule, which would have permitted those defendants to change the drainage if the advantage to the dominant land sufficiently outweighed the damage to the use of the servient land. The appellate court held the circuit court had properly submitted that question to the jury with a well-drawn instruction.

■ The *Dovin* instruction permitted the trier of fact, in balancing the advantages to the dominant tract against the injury to the servient land, to consider (1) the extent and nature of the harm; (2) "the social value attached to the type of use or enjoyment interfered with"; (3) "the suitability of the particular use or enjoyment [involved]"; (4) the burden on those harmed of avoiding harm; and (5) the usefulness of the improvement to the street. (*Dovin*, 164 Ill. App. 3d at 336, 517 N.E.2d at 1125.) That court deemed these factors to be consistent with the factors to be considered in determining whether a nuisance exists. See Restatement (Second) of Torts §833 (1979).

The decision in *Dovin* constitutes authority for application of a rule of reason, balancing the equities when disputes arise over changes in manner or rate of flow from dominant to servient estates. However, the observation in *Mileur* that no authority exists in this State to apply a similar rule of reason when a servient estate has obstructed the flow from the dominant estate to the damage of the dominant estate is very significant. We conclude the two situations are materially different. In *Templeton*, the supreme court noted the "good husbandry" rule "was embodied" in early drainage codes, and has continued in the present code (Ill. Rev. Stat. 1987, ch. 42, par. 1—1 *et seq.*) to provide for the extension of drains from dominant to servient land with damages to be awarded when "land was damaged in the process." (*Templeton*, 57 Ill. 2d at 139, 311 N.E.2d at 144.) On the other hand, section 2—12 of the Illinois Drainage Code speaks in absolute terms when it states that a "landowner shall not *** interfere with any ditches or natural drains which cross his land in such manner that such ditches or natural drains shall fill or become obstructed with any matter which shall materially impede or interfere with the flow of water." Ill. Rev. Stat. 1987, ch. 42, par. 2—12.

The somewhat different treatment given by the law when the flow from a dominant estate is obstructed by a servient one may result because a dominant owner usually has no way to drain off water without sending it through the servient estate, while sometimes a servient owner can divert excess water from a dominant estate. In any event, we hold that in a situation where, as here, obstruction by the servient estate is in issue, the court is not required to apply the reasonable-use rule.

■ The circuit court here, in a memorandum opinion, stated it did not consider itself to be required to apply a "reasonable use" rule. Nevertheless, the court did consider some factors which were in the *Dovin* instruction. The circuit court noted that the land of

defendant was very swampy when he purchased it and that he had not presented any evidence of the nature of the use he intended to make of the property. The court also considered the damage to the dominant Dessen estate. He concluded it was not overwhelming but that the puddling covered a greater area and lasted for a longer period than before. This was shown by Edward Dessen's testimony and by photographs. While the testimony of Edwin Keller, tenant in the building on the dominant estate, tended to minimize the damage from the extra water, the trial court heard and saw the witness and was entitled to give the evidence the weight it deemed appropriate. The court did express a conclusion that the amount of obstruction defendant placed upon the water course was unreasonable. Thus, although the court did not apply the reasonable-use doctrine set forth in *Dovin*, the court did balance the equities of the situation. The court did not err in its application of surface-water drainage law.

Defendant maintains the Dessens were not shown to be dominant owners because the swale the water followed was not one produced by nature, but was created when the land was scraped to provide dirt for the construction of an enlargement of Route 45. Early Illinois case law defined the term "natural water course," for the purpose of applying the civil law concepts we have discussed, in these terms:

> "If the conformation of the land is such as to give the surface water flowing from one tract to the other a fixed and determinate course, so as to uniformly discharge it upon the servient tract at a fixed and definite point, the course thus uniformly followed by the water in its flow, is a water-course ***."
> *Lambert v. Alcorn* (1893), 144 Ill. 313, 324, 33 N.E. 53, 56.

In *Gough v. Goble* (1954), 2 Ill. 2d 577, 119 N.E.2d 252, a plaintiff sought to enjoin a defendant owner of land across a road from blocking a drain under the road which had been used for more than 40 years to carry water from plaintiff's land to that of the defendant. The land at the defendant's side of the road around the opening of the drain had been some two feet lower than the rest of the defendant's land in the area. The defendant had built an obstruction to the opening of the drain only to the extent he had built the land there up to the level of the rest of his land at that point. Nevertheless, the supreme court held the plaintiff was entitled to a mandatory injunction requiring the restoration of the land at the opening of the drain to the condition existing for the period of more than 40 years. Because of the time span, the rights of the plaintiff were treated as existing just as if the course of this drainage had arisen through

nature and not through the construction of the road. No mention was made by the supreme court that the use by plaintiff or his predecessors in title needed to be adverse to the defendant.

Shortly after *Gough*, the supreme court also determined a use of an artificial water course for a long period permitted a dominant owner to continue its use just as if the course had been created naturally. There, the waterway had been created in the course of digging a borrow pit to obtain dirt to build a railroad. The court there did make a slight reference to the dominant estate's use of the water course being adverse, but spent most of the opinion in explaining why the water course had the qualities of a natural one. The court stated:

> "It is immaterial that this ditch in question is an artificial ditch rather than a natural stream. We believe that the correct applicable law is stated in 56 Am. Jur. p. 621, sec. 151, to-wit: 'An artificial waterway or stream may, under some circumstances, have the characteristics and incidents of a natural watercourse. In determining the question, three things seem generally to be taken into consideration by the courts: (1) whether the way or stream is temporary or permanent; (2) the circumstances under which it was created; and, (3) the mode in which it has been used and enjoyed. Where the way is of a permanent character, and is created under circumstances indicating an intention that it shall become permanent, and it has been used consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural watercourse, and treated, so far as the rules of law and the rights of the public or of individuals are concerned, as if it were of natural origin.' " *Saelens v. Pollentier* (1956), 7 Ill. 2d 556, 561, 131 N.E.2d 479, 482.

The circuit court here found the Dessens had acquired a right to discharge their water through swales which defendant had covered because of the use of that water course for a long period (1) created a use by prescription, and (2) created a situation whereby the water course should be treated as if it had been created by nature. We need not decide whether sufficient evidence was presented that the use by the Dessens or their predecessors was adverse, thus creating a prescriptive use. Under the theory of *Gough* and as explained in *Saelens*, the water course here could properly be treated as one created by nature. In the face of conflicting evidence, the court could properly find the swales had existed for many years. Here, as in *Saelens*, the water course was created because of the taking of earth

to create a roadbed. The court could also determine that the swales had been carrying the water for a sufficiently extended period of time to meet the requirements of *Saelens* and *Gough*. The evidence fully supported a determination the Dessens had a right for the continued use of the water course.

■■ As we have indicated, we conclude that although the damage to the Dessens' land by the greater flooding for longer periods of time was not great, it was of some substance. Monetary damage would be difficult to ascertain and would be inadequate because of the continuing nature of the trespass. Relying primarily upon the decision of this court in *Delano v. Collins* (1977), 49 Ill. App. 3d 791, 364 N.E.2d 716, defendant maintains the severity of damage here was insufficient to support a mandatory injunction. There, a servient tenant complained of the dominant owner's building of a house which mildly increased the runoff onto lands of the plaintiffs. This court held that the circuit court did not abuse its discretion in entering a summary judgment for that defendant as to a complaint which, among other relief, asked for a mandatory injunction which would have required the tearing down of the house erected by the defendant. This court noted the holding in *Templeton*, which indicated that the dominant urban estate could, within reason, increase the flow of water to land of servient tenants. While the language of *Delano* in regard to the necessity of proof to justify a mandatory injunction was strong, we do not deem that holding to be applicable to the situation here, where the *dominant* tenant sought a mandatory injunction and the circuit court saw fit to grant it.

■■ Finally, we came to the question of whether the decree is specific enough for defendant to know what he must do to comply. In part, the decree orders defendant:

> "[T]o forthwith place the property back to where the surface water drains from Plaintiffs' property as well as it did before Defendant performed work on his property ***."

In maintaining this mandate is sufficiently definite, the Dessens rely upon *Eberle v. Greene* (1960), 18 Ill. 2d 322, 163 N.E.2d 822, and *Gough*. In *Eberle*, the defendant was found to have obstructed the flow of surface water by increasing the elevation of a fence row and building a dam. The injunction granted ordered the defendants to restore the fence row to the condition existing in 1947. The supreme court concluded the order was sufficient to inform the defendants they must remove all the material they had placed on the fence row since 1947. The court stated the defendants knew what they had to do. *Gough* required a defendant to restore land at the outlet of a

drain to the condition prior to the construction of a dam. That would clearly require removal of the dam.

Here, the parties are in dispute as to what the situation was in regard to the swales before the spreading of the dirt, and are in disagreement as to what the nature of Dessens' drainage was prior to the spreading of the dirt. We do not interpret the decree to require defendant to remove all of the dirt placed upon his land. We recognize the difficulty in drafting an order as to what must be done with minute specificity, but we fear the instant order may lead to much further dispute. We agree with defendant that the order requires greater specificity.

Accordingly, as we have indicated, we affirm every aspect of the decree giving rise to the appeal and cross-appeal except to the portion of the decree describing what defendant is mandated to do. We reverse that portion of the order and remand to the trial court with directions to make that portion of the order more definite and certain. The trial court may, in its discretion, hear further evidence or arguments on that question. We strongly urge the parties to attempt to settle that portion of the decree by agreement and to establish as neighborly a relationship as possible. The evidence indicates they all have substantial drainage problems which can best be worked out through cooperation.

Affirmed in part; reversed in part and remanded with directions.

LUND and McCULLOUGH, JJ., concur.