No. 2--04--0698

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

MICHAEL J. BOLLWEG,      ) Appeal from the Circuit Court of

      ) Kendall County.

Plaintiff-Appellee,        )

      )

v.      ) No. 03--CH--187

      )

RICHARD MARKER ASSOCIATES, INC.,      ) Honorable

      ) Leonard J. Wojtecki,

Defendant-Appellant.        ) Judge, Presiding.

______________________________________________________________________________

JUSTICE CALLUM delivered the opinion of the court:

I. INTRODUCTION 

Plaintiff, Michael J. Bollweg, obtained a preliminary injunction preventing defendant, Richard Marker Associates, Inc., from changing the existing flow of water from defendant's property across plaintiff's property.  Defendant has brought this interlocutory appeal.  We affirm.

II. BACKGROUND

On November 5, 2003, plaintiff filed a complaint for damages and injunctive relief.  He and defendant own adjoining properties.  Plaintiff's property lies between defendant's property and the Fox River.  Defendant began developing its property, once agricultural, into a residential development.  Plaintiff alleged that, before the development, the storm water that fell onto defendant's property either seeped into the ground or flowed across plaintiff's property in a natural sheeting fashion.  According to plaintiff, the development altered the natural flow of storm water and caused excess water, silt, and debris to flow onto his property.  Defendant raised the affirmative defenses that (1) its storm water management system complied with the relevant municipal ordinances; (2) the "unclean hands" doctrine barred relief because plaintiff refused defendant's reasonable request to install at its cost an underground pipe to transport storm water across plaintiff's property; and (3) after learning of defendant's plans, plaintiff waited over one year, until after defendant began constructing the storm water management system, to file suit.

On January 26, 2004, plaintiff moved for a preliminary injunction.  The hearing on the motion took place during eight sessions between March 15, 2004, and April 14, 2004.  The evidence reveals the following.  Plaintiff's and defendant's properties were once part of the Taus farm.  In 1986, plaintiff purchased 17 acres from the Taus family trust.  He had the property rezoned for residential use and constructed his home on the property.  Also, plaintiff uses his property as a commercial nursery.  Plaintiff's property is in unincorporated Kendall County.  The remainder of the Taus property continued to be used as a farm. 

In October 2001, defendant contracted to purchase, for $4.28 million, 129 acres from the Taus family trust for the purpose of constructing 262 single-family homes.  The final subdivision plat was recorded in July 2002, and the City of Yorkville (City) annexed the property.  Defendant closed on the sale in January 2003.  The City approved the final engineering plans during the summer of 2003, and construction began in August 2003.  Defendant's property is immediately north of plaintiff's property.  Nearby, south of plaintiff's property, is the Fox River. 

Surface water from the southeast side of the Taus farm flowed into catchment No. 10, a tributary near plaintiff's property line.  From there, the water flowed into culverts underneath plaintiff's gravel driveway, which runs along the property line.  After exiting the culverts, the water flowed for some distance over grassy swale, over a wooded area, and then into a small stream on plaintiff's property.  When both plaintiff's and defendant's properties were part of the Taus farm, an agricultural drain tile ran along the eastern edge of the property.  The tile currently carries water under plaintiff's property and empties into the stream.  The stream leaves plaintiff's property and flows into a pond.  The pond empties into a canal lined with wood beams.  The canal runs under a gravel road and eventually empties into the Fox River.  Plaintiff's home sits on the northeast corner of the property, about 150 feet from the path of drainage.

Surface water from the southwest side of the Taus farm flowed into catchment No. 17.  From there, it moved onto plaintiff's property and flowed through a culvert underneath plaintiff's driveway.  The water flowed over open ground and then into plaintiff's woods.

Steven Roake, a civil engineer, testified that his firm, Roake and Associates, designed the storm water management system for the development.  Roake designed the system to comply with the applicable Yorkville ordinances.  Before defendant purchased its property, water from 62.7 acres of the Taus farm flowed into catchment No. 10.  The engineering plans called for modifying the topography of defendant's property so that more water will flow in the direction of catchment No. 10. 
 When the development is completed, surface water from 81 acres of defendant's property will flow into catchment No. 10.  Roake testified that the development will result in an increase in the amount of storm water flowing into catchment No. 10, but he could not quantify the increase.  

Defendant constructed retention ponds at the southwest and southeast corners of its property.  A diaphragm regulates the release of water from the ponds.  Water from the southeast pond is discharged through a pipe that empties into a stilling basin containing a level spreader, which creates a "waterfall" rather than a "shooting" effect.  The basin is lined with large rocks that help to filter out sediment before the water flows onto plaintiff's property.  Water from the stilling basin flows across the ground onto plaintiff's property and then into the culverts underneath plaintiff's driveway.  

Underneath the stilling basin is perforated field drainage tile that allows residual water in the basin to drain away.  The perforated field tile is connected to an existing eight-inch agricultural tile that ran across defendant's and plaintiff's properties.  Defendant removed the agricultural tile on its property except for a small segment that connects to the new perforated field tile.  Defendant did not obtain plaintiff's consent to connect to the agricultural tile.

Roake testified that, because the flow from the pond will be regulated, it will take about three times as long for storm water to flow off of defendant's property.  He acknowledged that the soil on plaintiff's property could become more saturated as a result.  Roake opined, however, that defendant's storm water management system will benefit plaintiff because it will reduce the flow during peak discharge periods.  Before the development, 110 cubic feet of water flowed onto plaintiff's property per second.  After the development, the flow will be reduced to 12 or 13 cubic feet per second.  The primary effect the development will have on plaintiff's property is related to the duration of flow instead of the amount of water.

Sometime before the preliminary approval of the project in November 2002, Roake met with plaintiff and viewed plaintiff's property.  Roake proposed having defendant install at its own cost an underground pipe across plaintiff's property, beginning at the southeast retention pond discharge point.  Roake brought up structuring the arrangement as either an easement or a license.  Plaintiff asked Roake to leave behind some wood stakes, which plaintiff used to mark where he wanted the pipe to be installed.  Roake's crew surveyed plaintiff's property and incorporated the proposed location of the underground pipe into the engineering plans.

During the hearing to approve the annexation and the development, plaintiff spoke and stated that he no longer desired any activity on his property.  Roake testified that, at some point, plaintiff expressed concern about his property being burdened by an easement.

James Koziol, a licensed public engineer, testified as plaintiff's expert.  His firm is involved in about 100 storm water management projects per year, about half of which involve the design of storm water management facilities.  He performed a comparative analysis of the flow from defendant's property onto plaintiff's property before and after the development.  For a 100-year storm event, an additional 1.49 million gallons of water, or 4.59 acre-feet, will flow across plaintiff's property after defendant's property is developed.  This represents a 15% increase in the volume of runoff, which, according to Koziol, is typical for a development like the one defendant proposed.

Koziol's report states that he assumed that a 100-year storm produces 7.58 inches of rain.  The computer-generated figures attached to the report appear to be based on an assumption of 8.47 inches.  Koziol acknowledged that the use of the higher figure would change his calculations.

Koziol also calculated flow durations for various storm events.  For example, before the development, it took 19 hours for the water resulting from a one-year storm to drain across plaintiff's property.  After the development, the flow duration will be 134 hours.  According to Koziol, soil that is exposed to water for a longer time tends to become more saturated.  He acknowledged, however, that, because of the reduced flow rate, the runoff after the development presented less risk of erosion,  and it was less likely that the watercourses on plaintiff's property would overflow.

Koziol based his calculations on the assumption that, both before and after the development, water from 81 acres of defendant's property flowed onto plaintiff's property.  When presented with the information that, before the development, water from only 62.7 acres of defendant's property flowed onto plaintiff's property, Koziol testified that the change in flow would be greater.

Joseph Wywrot, Yorkville's city engineer, testified that the development will result in an increase in the volume and duration of the flow across plaintiff's property.  He reviewed the storm water management plan to determine whether it complied with the Yorkville subdivision control ordinance but did not calculate the amount or duration of flow resulting from the development.  According to Wywrot, the increase in the volume of storm water was not something that he needed to consider when determining whether the plan complied with the ordinance.  To Wywrot's knowledge, the agricultural tile left in place had not been inspected.

During the construction of the development, plaintiff called Wywrot more than once to complain of excess water flowing onto his property as a result of dewatering activities on defendant's property.  Wywrot contacted defendant's contractors, who remedied the problems.  Wywrot testified that the incidents were construction-related and will not occur after the development is completed.

Christopher Burke, a civil engineer, testified that he reviewed the storm water management plan for defendant's development and opined that it complied with the Yorkville ordinance and prudent and sound engineering practices.  The plan took advantage of the existing drainage conditions on plaintiff's property by allowing water to flow in the same pattern as before the development.  Under the plan, the flow from the retention pond will be attenuated and will not adversely affect plaintiff's property.

Burke reviewed Koziol's water volume and flow duration figures and the accompanying computer-generated calculations.  Burke testified that Koziol's final figures were incorrect because they significantly overstated the durations as they appeared in the computer printout accompanying Koziol's report.  Burke concluded that, after the development is completed, only an additional .81 acre-feet of water would flow onto plaintiff's property after a 100-year storm event.  Thus, the difference between the predevelopment and postdevelopment runoff conditions will not be as great as Koziol claimed.
  Like Koziol, Burke relied on the assumption that, both before and after the development, runoff from 81 acres of defendant's property flowed onto plaintiff's property.  He acknowledged that the change in water volume would be greater if, before the development, runoff from only 62.7 acres of defendant's property flowed onto plaintiff's property. 

Clayton Marker, defendant's salesperson, testified that defendant has entered into contracts to sell about 160 of the lots on its property.  Contracts on another 75 to 80 lots were imminent.  Defendant had closed on the sale of one lot, and the closings on seven additional lots were pending.  Late in 2001 or early in 2002, Clayton and his father, Richard Marker, met with plaintiff and his wife, Sherri Bollweg.  Clayton denied that he or Richard told plaintiff and Sherri that, if they did not allow defendant to construct an underground pipe, they would continually have water running across their property.  Also, Clayton was present during a meeting between Roake, plaintiff, and Sherri.  Clayton never heard Roake say that plaintiff will not like the way the water will flow across his property without the underground pipe.

Richard Marker, defendant's president and principal shareholder, testified that defendant borrowed $3.5 million for the January 2003 closing on the property.  In July 2003, defendant borrowed $18.7 million to finance the development.  Defendant's loan costs total about $1,000 per day.  Richard did not believe that defendant could continue doing business if an injunction were in effect for more than a few months.  An injunction could cause defendant to default on its loans and all of the contracts it has on the property.  Richard acknowledged that, when defendant took on the debt associated with the development, he knew that plaintiff objected to the storm water runoff and was not going to grant defendant an easement.

The development plan calls for 2.02 units per acre.  The Yorkville zoning ordinance allows for as many as 3.4 units per acre.  On June 25, 2002, Richard met with plaintiff to discuss the storm water runoff onto plaintiff's property.  Richard recommended that plaintiff allow defendant to pay for and install an underground storm pipe on his property.  Plaintiff seemed receptive to the idea.  Richard never offered to compensate plaintiff for an easement across his property.  He denied telling plaintiff or Sherri that, without the underground pipe, they will have water running across their property continually.  He learned in November 2002 that plaintiff objected to storm water from the development flowing onto his property.  In April 2003, defendant's attorney received two letters from plaintiff's attorney objecting to the additional storm water runoff onto plaintiff's property.  After the development is complete, the City will take title to the storm water management system.

Sherri Bollweg testified that she and plaintiff informed Richard during their first meeting that they did not want an underground pipe on their property. On September 2, 2003,  January 21, 2004, and March 5, 2004, construction activities resulted in water flowing across plaintiff's property in volumes and patterns that had not occurred since Sherri began living on the property in 1991.  The water deposited silt onto plaintiff's property and caused erosion.  During the January incident, water flowed across the top of plaintiff's driveway.  During the March incident, the water flowed for about one week, and, at one point, the stream of water flowing across the swale was about 50 feet wide.  No water had flowed across plaintiff's property between the date the water from the March incident stopped flowing and the date of Sherri's testimony, March 29, 2004.  Sherri testified that there had been less than one inch of rain the day before she testified and that no water flowed across plaintiff's property as a result.

Plaintiff testified that water flowed from the Taus farm onto his property only after more than two to three inches of rain fell.  The flow never lasted more than 24 hours.  After defendant began developing the property, the flow of water exiting the agricultural drain tile on plaintiff's property appeared to be greater than anything plaintiff had observed before.  To plaintiff's knowledge, nobody has checked the integrity of the agricultural tile.  Also, before defendant began developing the property, the water exiting the tile was clear.  After the construction began, the water carried a great deal of sediment.  A considerable amount of sediment has accumulated in plaintiff's stream and on his woodland.  Plaintiff pumps water from the stream to water his trees.  Plaintiff acknowledged that there were one or two occasions before defendant purchased the Taus property when silt from the farm washed onto his property.  Before construction began, the path of water flowing across plaintiff's property was never more than 15 to 20 feet wide.  During the March 2004 incident, the path was over 50 feet wide and invaded part of his nursery.  At the time of his testimony on March 30, 2004, the ground near his nursery remained soggy, and his ability to bring equipment into the nursery was limited.  Plaintiff testified that it had rained since the March incident and that no water had flowed across his property as a result of the rain.

Plaintiff testified about an additional release of water from defendant's property on February 3, 2004, when the southwest retention pond overflowed during dewatering activities.  Water flowed across his property for about 24 hours.  Plaintiff introduced video of the water flow across his property that resulted from the construction-related incidents.

At no time did plaintiff tell defendant's representatives that he would grant defendant an easement or a license across his property or that he would allow increased volumes of storm water to flow across his property.  Also, he did not grant defendant permission to connect to the agricultural tile running under his land.  During the June 25, 2003, meeting with Roake, plaintiff stated that he was not interested in having his property torn up to install an underground pipe.  Roake told plaintiff that he will not like the flow of water over his property after the development is completed.  Plaintiff acknowledged that he placed wood stakes on his property to mark the area that he and Roake had discussed surveying.

Denny Porter testified that he owned property south of plaintiff's property and adjacent to the canal that carries water from plaintiff's property to the Fox River.  Porter's parents purchased the property in 1960, and Porter purchased the property from his parents around 1998.  Since 1960, there have been several occasions after heavy rainfalls, including one in July 1996, when the canal overflowed and flooded the road.  Also, over the years, Porter has seen upstream silt flowing into the pond.

Donald Dressel, a water resources engineer with Christopher Burke Engineering, testified that he performed water flow calculations based on Roake and Associates' plan for defendant's development.  According to Dressel, before the development, a one-year storm event caused 4.51 acre-feet, or 1.47 million gallons, of water to flow onto plaintiff's property.  The peak flow rate for such an event was 8.6 cubic feet per second, and it took the water 25 hours to drain.  After the development, a one-year storm will cause 6.78 acre-feet, or 2.2 million gallons, of water to flow onto plaintiff's property.  The peak discharge rate will be 2.7 cubic feet per second, and the water will take 75 hours to drain.  Before the development, a 100-year storm produced a flow of 27.08 acre-feet, or 8.8 gallons, of water.  The peak discharge rate was 44 cubic feet per second, and the water took 25 hours to drain.  After the development, a 100-year storm will generate 36.85 acre-feet, or 12 million gallons, of water.  The peak discharge rate will be 11.9 cubic feet per second, and the water will take 129 hours to drain.

Dressel viewed and photographed plaintiff's property on April 2, 2004.  He testified that there was some water exiting the southeast retention pond from the stilling basin and that it was clear.  There was no water flowing through the pipes under plaintiff's driveway.  The grassy swale area was firm and dry, and Dressel saw no silt deposits or signs of erosion.  Trees that stood in or near the swale had mulch around their bases, and there were no signs that mulch had been washed away.  Dressel saw plaintiff drive a golf cart across the swale.  Along the stretch where the water enters the wooded area, the ground was covered with moss that appeared to have been there for some time.  The tributary that runs along the wooded area contained no running water but was somewhat wet.  The stream had one area of silt.  Water from the agricultural drain tile was emptying into the stream.  The water level rose to one inch below the bottom of the pipe, and the water was clear.

Dressel saw some erosion and a small amount of sediment in a 40-foot segment of the swale that carries water from catchment No. 17.  He saw no evidence of silting in the wooded area downstream from the swale near catchment No.  17.  The ground in these areas was dry.  Dressel testified that the stilling basin will filter most of the sediment before the water moves onto plaintiff's property.

Gary Neyer, the project manager of defendant's development, testified that about 50% of the underground improvements and some of the roadbeds and curbs are in place.  Although there is more grading work to be done on the southwest retention basin, the physical shape of the basin is complete, and the inlet and outlet pipes are in place.  The grading work on the southeast basin is complete, and the inlet and outlet pipes are in place.  The southeast basin began operating on March 12, 2004. Neyer anticipated that the landscaping work on the southeast basin would be complete within two weeks.  The roads and underground improvements would be completed in June 2004.  Defendant's work on the development would be completed in July 2004.  At that point, the home builders who  purchased the lots from defendant would begin constructing homes.

On January 21, 2004, defendant's contractor was dewatering near the southwest basin in order to install a deep sanitary line.  That evening, Neyer received a report of water flowing onto plaintiff's property.  The following morning, Neyer went to the site and learned that the contractor had stopped the leak at about 8 p.m. the previous evening.  Early in February 2004, one of the dewatering pipes leaked and spilled water onto plaintiff's property.  Defendant's contractor repaired the leak.  The March 5, 2004, incident occurred while defendant's contractor was pumping water that had accumulated in the southeast basin.  Neyer testified that all of the construction activities that had caused irregular amounts of water to flow onto plaintiff's property were completed, and he did not foresee any risk that such incidents would recur.  Neyer had not seen any water flowing across plaintiff's property since March 15, 2004, even though there had been some rain.

In rebuttal, plaintiff testified that, in 1999, he and Porter had a heated argument about Porter's son parking his vehicle on plaintiff's property.  Plaintiff testified that some areas over which water flowed remained wet and contained silt.  Plaintiff introduced photographs purporting to show silt and erosion at certain locations on his property.  Since the construction activities began, every rain event producing at least one-quarter inch of rain has caused silt to wash onto plaintiff's property.

The trial judge traveled to the site to view the property.  The court ruled on June 4, 2004.  The court initially cited the principle that an upper landowner bears the duty not to increase the natural flow of surface water onto the property of an adjacent landowner.  See 
Van Meter v. Darien Park District
, 207 Ill. 2d 359, 369 (2003).  According to the court, "[d]efendant does not deny that there is a substantial increase in the flow of water onto the Plaintiff's property due to the development."  The trial court also found that "the increased volume of surface waters onto the Plaintiff's land is beyond a range consistent with a policy of reasonableness of use in any event."  Considering the hardships that an injunction would cause defendant, the court stated that defendant proceeded with the development even though it knew beforehand that plaintiff would not grant an easement and vigorously objected to the development because he feared an increase in the flow of water across his property.

The trial court issued a preliminary injunction preventing defendant from (1) continuing the development until it removes the unnatural accumulations of water or otherwise redesigns the storm water management system to prevent such an unnatural accumulation; (2) using the preexisting agricultural drainage tile as a discharge outlet for the southeast basin; (3) draining the southeast basin through any unnatural method, including restrictor pipes, that would change the predevelopment flow of water across plaintiff's property; and (4) from causing unnaturally accumulating water from the southwest basin to flow across plaintiff's property.  The trial court denied defendant's motion to stay the injunction pending appeal.  Defendant filed a timely interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (Official Reports Advance Sheet No. 5 (March 5, 2003), R. 307(a)(1), eff. January 1, 2003).

III. DISCUSSION

Defendant has moved to strike plaintiff's brief, and we have ordered the motion taken with the case.  Defendant claims that plaintiff's statement of facts is argumentative and makes assertions that are not supported by the record.  Plaintiff's statement of facts is generally accurate and free of argument.  See 188 Ill. 2d R. 341(e)(6).  The argument section of plaintiff's brief contains an adequate legal discussion and is within the bounds of proper advocacy.  Although the brief contains a few statements that are not supported by the record, the statements do not hinder our review.  We have reviewed the record and will disregard any unsupported assertions.  See 
Merrifield v.  Illinois State Police Merit Board
, 294 Ill. App. 3d 520, 527 (1997) (although brief contained some improper argument and inaccurate portrayals of evidence, striking brief was not necessary, and reviewing court would merely disregard portions of brief that did not comply with supreme court rules)
.  Accordingly, we deny defendant's motion to strike plaintiff's brief.

A preliminary injunction is intended to preserve the status quo pending a decision on the merits of a case.  
Nickels v.  Burnett
, 343 Ill.  App.  3d 654, 662 (2003).  It is an extreme remedy that should be employed only when an emergency exists and serious harm would result if the injunction is not issued.  
People ex rel. Klaeren v. Village of Lisle
, 202 Ill. 2d 164, 177 (2002).  A court may not grant a preliminary injunction without a showing that: (1) the party seeking the preliminary injunction possesses a clear right or interest needing protection; (2) the party has no adequate remedy at law; (3) irreparable harm will result if the preliminary injunction is not granted; and (4) there is a reasonable likelihood of success on the merits.  
People ex rel. White v. Travnick
, 346 Ill. App. 3d 1053, 1060 (2004).  Also, the trial court must decide whether the balance of hardships to the parties supports granting a preliminary injunction.  
Keefe-Shea Joint Venture v. City of Evanston
, 332 Ill.  App. 3d 163, 169 (2002).

A plaintiff seeking a preliminary injunction does not carry the same burden of proof that is required to prevail on the ultimate issue.  
Keefe-Shea
, 332 Ill. App. 3d at 169.  Instead, the plaintiff must make a 
prima facie
 showing that there is a fair question about the existence of the claimed right and that the circumstances lead to a reasonable belief that the plaintiff will be entitled to the relief sought.  
Village of Westmont v. Lenihan
, 301 Ill. App. 3d 1050, 1055 (1998).  A reviewing court will overturn a trial court's decision to grant a preliminary injunction only if the court abused its discretion.  
People ex rel. Klaeren
, 202 Ill. 2d at 177.

Defendant argues that we should review the trial court's decision 
de novo
 because the facts are undisputed and therefore only the trial court's legal conclusion is at issue.  See 
La Hood v.  Central Illinois Construction, Inc.
, 335 Ill. App. 3d 363, 364 (2002).  We disagree.  This cause turned heavily on factual considerations.  Although there was no dispute that the development will increase the amount of water flowing across plaintiff's property, the trial court had to consider conflicting expert evidence about the effect of the development on plaintiff's property and balance the benefits of granting a preliminary injunction against the hardships defendant might suffer as a result.  Also, as we discuss further below, we do not believe that the trial court misapplied the law.  Accordingly, we apply the abuse of discretion standard.

Initially, defendant argues that the Illinois Drainage Code (Code) (70 ILCS 605/1--1 
et seq.
 (West 2002)) granted it the right to connect the field tile beneath the stilling basin to the agricultural tile running underneath plaintiff's property.  The core principle governing the drainage of surface water is that "[l]and may be drained in the general course of natural drainage by either open or covered drains." 70 ILCS 605/2--1 (West 2002).  Section 2--8 of the Code provides:

"When a ditch, covered drain or levee is privately constructed through or on a tract of land and the ownership of such tract is thereafter divided, such ditch, covered drain or levee shall thereupon be deemed a drain or levee for the mutual benefit of all the portions of the original tract connected to, or protected by, such ditch, covered drain or levee."  70 ILCS 605/2--8 (West 2002).

According to section 2--10, "[d]rains and levees deemed to be for the mutual benefit of the lands connected or protected shall constitute a perpetual easement on such lands and shall not be filled, obstructed, breached or impaired in any way without the consent of the owners of all such lands."  70 ILCS 605/2--10 (West 2002).

There is no dispute that, when plaintiff purchased his property, the agricultural tile was a drain for the mutual benefit of plaintiff's property and the Taus farm.  Defendant has removed most of the agricultural tile on its property and constructed a retention pond that will drain in part through plaintiff's tile.  Having changed the character of the easement, defendant cannot now claim an easement pursuant to the Code.  An easement once definitely settled and located cannot be changed by either party without the consent of the other where the change results in a substitution of a servitude different from that which existed previously.  
Sullivan v. Bagby
, 335 Ill. 192, 195-96 (1929); 
Continental Illinois National Bank & Trust Co. of Chicago v. Village of Mundelein
, 85 Ill. App. 3d 700, 706 (1980).  Thus, the owner of the dominant estate may not materially alter the character of the easement.  
Triplett v. Beuckman
, 40 Ill. App. 3d 379, 382 (1976).  Here, we have no difficulty concluding that defendant has materially altered the character of the easement.  The agricultural tile was designed to carry surface water away from the Taus farm, and defendant has turned it into a partial outlet for a storm water retention pond.

In rejecting defendant's contention based on the Code, we do not hold that defendant's connection to the agricultural tile is necessarily illegal.  Instead, we simply hold that defendant does not have an easement under the Code.  It is still necessary to consider defendant's actions under the common law governing the drainage of surface water.

The starting point of the analysis is the "civil rule," which is reflected in section 2--1 of the Code.  Under that rule, the owner of the dominant or higher land has a natural easement over the servient or lower land to allow surface water to flow naturally off the dominant estate and onto the servient estate.  
Peck v. Herrington
, 109 Ill. 611, 619 (1884); 
Coomer v. Chicago & North Western Transportation Co.
, 91 Ill. App. 3d 17, 22 (1980).  The owner of the servient estate is not obligated to receive surface water in different quantities or at different times than would come to his land ordinarily.  
Dovin v. Winfield Township
, 164 Ill. App. 3d 326, 334 (1987), 
overruled on other grounds
, 
Gerill Corp. v. Jack L. Hargrove Builders, Inc.
, 128 Ill. 2d 179 (1989).

The civil rule has been modified by the "good husbandry" exception, which permits the owner of dominant agricultural land to increase or alter the flow of water upon a servient estate if this is required for proper husbandry of the dominant land.  
Dessen v. Jones
, 194 Ill. App. 3d 869, 876 (1990); see also 
Bossler v. Countryside Gardens, Inc.
, 44 Ill. App. 3d 423, 424 (1976) (rule that owner of dominant estate may do nothing to increase burden of surface water drainage upon owner of servient estate is subject to the good husbandry exception, which permits interference by dominant estate owner when incidental to the reasonable development of the dominant estate for agricultural purposes).

Although the good husbandry exception developed to promote agriculture, our supreme court has stated that the general principle applies to urban and suburban settings:

"The question *** is whether the increased flow of surface waters from the land of the defendants to that of the plaintiff, regardless of whether it was caused by diversion from another watershed, the installation of septic tanks, the grading and paving of streets, or the construction of houses, basements and appurtenances, was beyond a range consistent with the policy of reasonableness of use which led initially to the good-husbandry exception."  
Templeton v. Huss
, 57 Ill. 2d 134, 141 (1974).

The owner of a dominant estate does not have an unlimited right to increase the rate or amount of surface-water runoff flowing onto the land of a servient estate.  
Callahan v. Rickey
, 93 Ill. App. 3d 916, 919 (1981).

Applying 
Templeton
, this court has stated that the potential for economic loss resulting from an increase in the flow of water onto the servient estate should not be disregarded, as would happen  if the focus were solely on the dominant estate.  Likewise, the potential benefits resulting from developing real estate in a dominant position should not be ignored.  Consequently, the benefit to the dominant estate should be balanced against the harm caused to the servient estate.  
Dovin
, 164 Ill. App. 3d at 335.

Initially, we reject defendant's suggestion that, because its storm water management system complied with the Yorkville ordinances and sound engineering practices, the increase in the amount of water flowing onto plaintiff's property is 
per se
 reasonable.  This litigation involves state law, which defendant cannot bypass merely by obtaining the City's approval of the storm water management system.  See 
Van Meter
, 207 Ill. 2d at 369 (applying common law governing drainage of surface water to local public entity); 
Salzman v. Sumner Township
, 162 Ill. App. 3d 92, 94 (1987) (township must construct its roads subject to common-law drainage rules); see also Yorkville City Code §11--5--9(B) (eff. March 9, 2000) ("If the surface water drainage will be changed by the construction of the subdivision, *** such surface waters shall not be deposited on the property of adjoining land owners in such a manner as to cause erosion or other damage").  Moreover, according to the City's engineer, the Yorkville ordinance is not concerned with the increase in the volume of surface water and therefore does not address the legal issues present here.  An additional consideration is that plaintiff's property does not lie within the Yorkville city limits.  Therefore, we consider the evidence only as it is relevant to the legal framework set forth above.

Having set forth the governing legal standards, we now examine whether the trial court abused its discretion when it found that all of the elements for issuing a preliminary injunction had been established.  Again, those elements are: (1) a clear right or interest needing protection, (2) no adequate remedy at law, (3) irreparable harm, and (4) a reasonable likelihood of success on the merits.

Initially, we reject defendant's assertion that the trial court failed to make findings sufficient to support its ruling and facilitate review.  The trial court issued a two-page memorandum decision specifically finding that plaintiff had satisfied each element for issuing a preliminary injunction.  The decision contains at least a brief explanation associated with each element.  Defendant cites no authority supporting its contention that more detail was required.  See 155 Ill.  2d R. 366(b)(3)(I) (in a nonjury case, no special findings of fact are necessary to support the judgment or as a basis for review).  A review of the record and the memorandum decision makes it possible for us to decide whether the trial court erred.

The trial court reasonably could have concluded that plaintiff established a clear right or interest needing protection.  To prevail at trial, plaintiff will have to establish that the increased flow of surface water onto his property exceeds a range consistent with the policy of reasonable use that led initially to the good husbandry exception.  
Templeton
, 57 Ill. 2d at 141.  We disagree with defendant's contention that the trial court applied an improper legal standard.  The court initially stated that an upper landowner may not collect and discharge onto a servient estate any surface water that would not naturally flow in the direction of the servient estate.  As the above discussion of the relevant legal principles reveals, this is an incomplete statement of the law.  Nevertheless, the trial court went on to find that the development will result in a "substantial increase" in the flow of water onto plaintiff's property and that the increased volume will be beyond a range consistent with a policy of reasonable use.

T
he
 evidence supports the trial court's findings.  There is no dispute that the development will increase the volume of water flowing onto plaintiff's property.  There also is no dispute that the increase will be the result of the addition of impervious surfaces and the regrading of the land so that surface water from an additional 18 acres of defendant's property will drain onto plaintiff's property.  Defendant's expert's own calculations reveal 
that, for a one-year storm, the volume of water flowing onto plaintiff's property will increase by about 50%.  The increase during a 100-year storm will be about 36%.  The development will cause surface water to be collected near the property line and discharged over a longer period, thus potentially increasing the time that plaintiff will be unable to use certain parts of his property.  This factor is not insignificant in light of the evidence that the grassy swale is near plaintiff's nursery and that soggy ground could limit plaintiff's ability to bring equipment into the nursery.

Defendant presented evidence that its storm water management system was reasonable because it accommodated existing drainage patterns and will benefit plaintiff's property by filtering sediment and reducing the flow rate.  The evidence was subject to conflicting interpretations, and we cannot say that the trial court's reliance on the evidence of increased volume and duration of flow was unreasonable.  At this stage of the proceedings, plaintiff at least has established a clear property right requiring protection.

Defendant does not seriously challenge the trial court's finding that plaintiff has no adequate remedy at law.  A preliminary injunction may issue where damages are difficult to quantify at the time of the hearing.  
Hough v. Weber
, 202 Ill. App. 3d 674, 687 (1990).  Here, the trial court reasonably could have concluded that the recurring nature of the anticipated releases of water onto plaintiff's property made it difficult to quantify the damages that plaintiff would suffer.  The trial court viewed photographic and video evidence of mature trees, which are difficult to both replace and attach a value to,  near the paths over which the water flows.  An additional factor making damages difficult to ascertain is that the retention basins had not been in place very long and, therefore, there had been insufficient time to observe their effect.  Thus, at this stage of the litigation, it is difficult to quantify the effect the development will have on plaintiff's property.

Defendant argues that there is no evidence of irreparable harm.  It emphasizes that the only releases of water onto plaintiff's property were the result of construction activities and that such incidents will not recur once the development is completed.  Although we agree with defendant's characterization of the facts, defendant's contention misapprehends the nature of irreparable injury.  To demonstrate irreparable injury, the moving party need not show an injury that is beyond repair or compensation in damages, but rather need show only transgressions of a continuing nature.  
Continental Cablevision of Cook County, Inc. v. Miller
, 238 Ill. App. 3d 774, 788 (1992).  Here, although there was little anecdotal evidence of water flowing onto plaintiff's property because of rain, the expert evidence established that the development will increase the amount of water flowing onto plaintiff's property.  
Cf.
  
Lindberg v. Lemenager
, 73 Ill. App. 3d 623, 626-27 (1979) (injunctive relief properly denied where plaintiff failed to prove that drainage ditch defendants constructed on their property increased the flow of water onto plaintiff's land).  The releases will be recurring.  If defendant were permitted to continue developing the property and plaintiff ultimately prevailed on the merits, it would be more difficult to grant plaintiff any effective relief.  Thus, the evidence established an emergency situation justifying maintaining the status quo (
i.e.
, the predevelopment levels of drainage) pending a decision on the merits.

For the reasons stated above, plaintiff has established a reasonable likelihood of success on the merits.  Although there is conflicting evidence about the effect the storm water management system will have on plaintiff's property, plaintiff at least has established a fair question about the existence of the right claimed and a reasonable belief that he probably will be entitled to relief.

Also, the trial court appropriately considered the hardships that may occur as a result of issuing a preliminary injunction.  We cannot say that the trial court abused its discretion by finding that the possibility that defendant will suffer serious economic harm was offset by defendant's electing to proceed with the development knowing that plaintiff objected to the increase in the flow of water across his property.  The evidence indicates that the development could significantly interfere with plaintiff's use and enjoyment of his property and that defendant took a calculated risk by proceeding with the development.

Defendant argues that the trial court's ruling in effect means that no development can ever take place because development necessarily increases the amount of surface water.  We disagree.  The test is reasonableness of use, and what is reasonable will vary depending on the characteristics of the properties involved.  Also, defendant's contention does not take into account the possibility of compensating a downstream landowner for an easement across his or her property.  The trial court's ruling merely reflects that the property rights of each party must be considered.

An abuse of discretion occurs when no reasonable person would take the trial court's view.  
Anest v. Audino
, 332 Ill. App. 3d 468, 479 (2002).  Considering the evidence, we cannot say that the trial court's ruling was unreasonable.  We express no opinion on the merits of the case beyond what is necessary to conclude that the trial court did not abuse its discretion by issuing the preliminary injunction.

IV.  CONCLUSION

The judgment of the circuit court of Kendall County is affirmed.

Affirmed.

HUTCHINSON and GROMETER, JJ., concur.