# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Swigert v. Gillespie*, 2012 IL App (4th) 120043

---

| | |
|---|---|
| Appellate Court Caption | P. CURTIS SWIGERT, MARY SUE SWIGERT, JERALD E. CAMP, TINA M. CAMP, and DIANNA H. KUPISH, Plaintiffs-Appellants, v. MATTHEW J. GILLESPIE and ALISON E. GILLESPIE, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-0043 |
| Argued<br>Filed | August 7, 2012<br>September 21, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the effect of a berm created by defendant owners of servient property on the flow of water from the plaintiff's dominant property, the trial court erred by balancing the hardships in allowing defendants to obstruct the flow and erred in dismissing the claims of two other servient owners on the ground that those claims were not supported by the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 09-MR-304; the Hon. Albert G. Webber, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Carl J. Tenney (argued), of Hughes & Tenney, L.L.C., of Decatur, and Glenn A. Braden, of Braden Law Office, of Neoga, for appellants. |
| --- | --- |
| | Darrel F. Parish (argued), of Parish & Castleman, LLP, of Decatur, for appellees. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Pope and Knecht concurred in the judgment and opinion. |

## OPINION

¶ 1 In October 2008, defendants, Matthew J. Gillespie and Alison E. Gillespie, constructed a dirt berm along the boundary line between their property and the property of plaintiffs, P. Curtis Swigert and Mary Sue Swigert. The Swigerts and coplaintiffs, Jerald E. Camp, Tina M. Camp, and Diana H. Kupish, later sued, alleging that the Gillespies' berm caused water to back up and "pond" on their properties.

¶ 2 Following a March 2011 bench trial, the trial court entered judgment in favor of defendants, dismissing with prejudice the Camp and Kupish claims and denying the Swigert claims.

¶ 3 Plaintiffs appeal, arguing that the trial court erred by denying their request for injunctive relief because the court improperly applied a balancing-of-hardships approach to assess whether defendants, as servient property owners, could alter the natural flow of water from plaintiffs' properties.

¶ 4 We reverse and remand for further proceedings.

¶ 5 I. BACKGROUND

¶ 6 The Swigerts own approximately 10 acres of land in Blue Mound, Illinois. Their property is adjoined on the west by a residential subdivision known as Rainey's Country Acres. The Camps, Kupish, and the Gillespies, respectively, own separate parcels of land on the eastern edge of the subdivision, which abut the western edge of the Swigert property. The Camp property, lot 6, is located the furthest north. The Kupish property, lot 8, lies directly south of the Camp property. To the south of the Kupish property is lot 9, a parcel of property owned by the Burnses, who are not parties to this lawsuit. South of the Burns property lies the Gillespie property, lot 10. A map of the properties is appended.

¶ 7 In October 2008, the Gillespies installed a dirt berm along the property line between their land and the Swigerts' land. In April 2009, the Swigerts filed a complaint for injunctive relief against the Gillespies, seeking to require them to remove the berm because it caused water

to back up and "pond" on the Swigert property. In February 2010, the Swigerts, the Camps, and Kupish filed a motion for joinder of plaintiffs and to file an amended complaint. The amended complaint asserted that the Gillespies' berm also caused ponding on the Camp and Kupish properties. The following month, the trial court granted the plaintiffs' motion by agreement of the parties.

¶ 8        At a March 2011 bench trial, the parties presented the following evidence.

¶ 9        P. Curtis Swigert testified that he purchased his 10-acre property in 1990. Swigert lives on two acres of the land and farms the remaining acreage. In October 2008, the Gillespies installed a 3 1/2-foot-high berm along the back of their property line, dumping dirt over the chain-link fence that previously ran along the property line. After the Gillespies built the berm, water began backing up against it over an area of the Swigerts' land measuring approximately 150 to 180 feet by approximately 60 to 80 feet. Swigert testified that the water backs up on his property whenever it rains an inch or an inch and a half, adding that the water also backs up onto the Camp and Kupish properties.

¶ 10       On cross-examination, Swigert acknowledged that he did not experience crop loss from the standing water. Swigert noted that before the Gillespies constructed their berm, David Walsh, who owned the parcel immediately south of the Gillespie property, constructed a berm along the property line between the Walsh property and the Swigert property. Walsh also constructed a berm projecting from the southeast corner of the Gillespie property onto Swigert's field, along with what he described as a 15-foot-long funnel. Swigert testified that at that time, a berm did not exist behind the Gillespie house.

¶ 11       A 50-foot-wide drainage easement runs between the Walsh and Gillespie properties. Swigert stated that the drainage ditch provides some drainage from his property, depending on the amount of rain the area receives. The ditch runs into two pipes under an adjoining road that drains into another ditch on the other side of the road.

¶ 12       Matthew J. Gillespie testified that in October 2008 he built a berm between his property and the Swigerts' to stop the flow of water from the Swigert property from damaging more of his home. Gillespie said that the berm effectively directed the water toward the ditch between his property and the Walsh property, and since building the berm, he has not experienced as much water in his crawl space. Gillespie testified that when he moved into his property in 2004, a small berm ran behind both his property and the Burns property. Gillespie added dirt to fill in the low spots of the berm. A berm also projected east from the southeast corner of the Gillespie property. According to Gillespie, the berms behind the Walsh property and the Burns property still exist.

¶ 13       Tina Camp testified that she moved into her home in 1999. In October 2009, she experienced "major" water accumulation in her backyard for the first time. The trial court admitted into evidence photographs that Camp took depicting the Camp, Kupish, and Gillespie properties after rainfalls in October 2009 and June 2010. According to Camp, the Gillespies experienced some standing water after the June 2010 rain, but "nothing like [she] did." On cross-examination, Camp acknowledged that she did not know how much it rained in October 2009 or June 2010. She stated that she did not have any knowledge of whether a berm existed before the Gillespies' berm.

¶ 14    Philip W. Cochran, a consulting engineer, testified that plaintiffs retained him to inspect the Swigert and Gillespie properties as well as the adjoining properties, requesting that he determine the natural drainage of the properties and whether the berm had affected the area's natural drainage. In March 2010, Cochran's field crew conducted topography in the area, considering the land elevations and also the physical features of the area such as trees, fences, and culverts. Cochran and his crew input the elevations they took into a computer to produce a topography map, which the trial court admitted into evidence.

¶ 15    Based on this topography, Cochran concluded that water generally drains from the east of the Swigert property to the west across the subdivision. More specifically, Cochran testified that water drains from the Swigert property northeast to southwest and southeast to northwest into the drainage ditch between the Walsh and Gillespie properties. When asked by the trial court whether he believed the Walsh and Gillespie properties were "optimal" places to site homes, Cochran stated that, based on the natural drainage of the area, he would "choose a higher property to build on if [he] were [going to] build a home." Cochran concluded that the Gillespies' berm interfered with the northeast to southwest water flow and could cause up to five inches of additional water in the area of the Swigert property abutting the Gillespie and Walsh properties.

¶ 16    Cochran also identified a ridgeline, or high point, at the center of the Burns property, running directly east from the boundary line between the Swigert and Burns properties and then continuing diagonally across the Swigert property in a southeasterly direction. Cochran noted that the area of the Swigert property north of the ridgeline drains to the northwest of the ridgeline, which would manifest as "sheet flow across the properties" in the subdivision. Cochran opined that, depending on the amount of rainfall the area received, the berm "could" affect drainage from the Swigert property toward the Camp property. He explained that the ridgeline is "not that high" and that the berm is higher than the elevation of the Camp property, so if the area received four inches of rain, he said, "perhaps [the water] would cross [the] ridgeline because of being backed up" by the berm. Cochran testified that a four-inch rainstorm is rare, with a 2% chance of occurrence each year. He acknowledged, however, that the area around Blue Mound had recently experienced a significant amount of rain. He also testified that, historically, a berm may have "possibly" been built on the property to the north of the Gillespies (the Burns property).

¶ 17    David Walsh testified that he moved into the home just south of the Gillespies in July 1986. After Swigert converted his property from sheep pasture into farmland sometime after 1990, Walsh and his neighbors began experiencing problems with flooding. Walsh testified that, according to a plat of the subdivision, a drainage easement ran between his property and the Gillespie property. In 1996, with the agreement of the Swigerts, Walsh and his neighbor (the previous owner of the Gillespie property) dug a 10-foot ditch between their properties and directed the water from the Swigert property into the drainage easement by filling in a dip that existed in the center of Walsh's backyard. That same year, the previous owner of the Gillespie property also constructed a berm behind his property that measured roughly the same height as the berm the Gillespies later built. Walsh believed that, before he and his neighbor dug a ditch between their properties, a similar ditch existed but became filled in with silt.

¶ 18 Diana Kupish testified that in the fall of 2008, spring of 2009, and June 2010, water seeped into her crawl space. In total, she estimated she has had to use her sump pump "seven or eight times" since October 2008, whereas before October 2008, she only had to use it "once every three years." She explained that water does not flow directly from the Swigert property, but rather, it drains onto her property when four or five inches of water accumulate on the Camp property.

¶ 19 Tom Ritter testified that he farms corn and beans on the tillable portion of the Swigert property as well as the adjacent property. He personally observed standing water east of the Gillespies' berm "following big rains." He testified the standing water affected approximately half an acre of the Swigerts' land, reducing that area's productivity by 10% to 20%. Ritter said that before Walsh owned his property, Walsh's yard contained a cutout ditch, such that water flowed at a 45-degree angle across Walsh's yard. Later, the former owner of the Walsh property filled in the ditch, and at that point, the water began traveling over the northern half of Walsh's backyard. (A 10-inch tile also runs underneath the Gillespie house.)

¶ 20 Following closing arguments, the trial court took the matter under advisement. On April 6, 2011, the court entered a docket entry denying plaintiffs' request for injunctive relief. First, the court dismissed the Camp and Kupish claims, finding they were not supported by the evidence. Specifically, the court noted that Cochran's topographic study clearly showed that the Camp and Kupish properties were located north of the ridgeline, and Cochran testified that the Gillespies' berm only caused ponding south of the ridgeline.

¶ 21 With respect to the Swigert claim, the docket entry noted that since 1990, the residents of Peggy Dee Drive had attempted various solutions to control the drainage from the Swigert property. The court found the Gillespies' berm most likely increased the flow of water in the existing ditch between the Walsh and Gillespie homes but did not obstruct the "natural flow of drainage" because the " 'natural flow' was channelized some time ago into the ditch." Relying on *Bollweg v. Richard Marker Associates, Inc.*, 353 Ill. App. 3d 560, 818 N.E.2d 873 (2004), the court concluded that the balance of hardships favored the Gillespies. Thus, the court denied the Swigerts' request for injunctive relief but precluded the Gillespies from taking any further steps to alter the flow of water from the Swigert property without the Swigerts' permission.

¶ 22 The following month, plaintiffs appealed. In response, defendants cross-appealed, or, in the alternative, filed a motion to dismiss plaintiffs' appeal for lack of a final judgment. In September 2011, this court allowed defendants' motion, dismissing the parties' appeals and remanding the matter to the trial court for further proceedings or the entry of a final order. *Swigert v. Gillespie*, No. 4-11-0394 (Sept. 23, 2011) (unpublished order under Supreme Court Rule 23).

¶ 23 In October 2011, plaintiffs filed a motion for entry of a final judgment order. In December 2011, the parties stipulated to the entry of the trial court's order, which incorporated the court's analysis outlined in the April 2011 docket entry. The parties also stipulated that no award of money damage should be made to plaintiffs. The court entered its order on December 27, 2011.

¶ 24    This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, plaintiffs argue that the trial court erred by denying their request for injunctive relief because the court improperly applied a balancing-of-hardships approach to assess whether the Gillespies, as the servient property owners, could alter the natural flow of water from the plaintiffs' property. We agree.

¶ 27    To be entitled to a permanent injunction, the party seeking the injunction must demonstrate (1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists. *Robrock v. County of Piatt*, 2012 IL App (4th) 110590, ¶ 64, 967 N.E.2d 822.

¶ 28    Initially, the parties dispute the appropriate standard of review in this case. Generally, we will not overturn a trial court's order with respect to a permanent injunction unless it is against the manifest weight of the evidence. *Id.* A trial court's judgment is against the manifest weight of the evidence "only if the opposite result is clearly evident." (Internal quotation marks omitted.) *Id.* However, when the case raises pure questions of law, we review the trial court's determination of the merits of the permanent injunction *de novo*. *Christian Assembly Rios de Agua Viva v. City of Burbank*, 408 Ill. App. 3d 764, 768, 948 N.E.2d 251, 255 (2011).

¶ 29    Here, plaintiffs argue that the trial court improperly applied Illinois surface drainage law by balancing the hardships. Plaintiffs thus raise a question of law, to which we will apply a *de novo* standard of review. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12, 965 N.E.2d 393. However, we note that rather than apply a balance-of-hardships approach to the Camp and Kupish claims, the trial court dismissed those claims with prejudice after finding that they were not supported by the evidence. Accordingly, we address the Camp and Kupish claims separately, applying a manifest-weight-of-the-evidence standard.

¶ 30                          A. The Swigert Claims

¶ 31    The Swigerts argue that the trial court erred in applying a balancing-of-hardships approach to determine whether to grant injunctive relief.

¶ 32    Illinois follows a modified version of the "civil law rule" of surface-water drainage, under which a landowner's right to alter the flow of surface water on his property depends on whether the landowner possesses the higher (dominant) or lower (servient) estate. *Templeton v. Huss*, 57 Ill. 2d 134, 137, 311 N.E.2d 141, 144 (1974); *Mileur v. McBride*, 147 Ill. App. 3d 755, 758-59, 498 N.E.2d 581, 583 (1986). A dominant landowner may alter or increase the natural flow of water from his property if the advantages to the dominant land sufficiently outweigh the damages to the servient land. *Dovin v. Winfield Township*, 164 Ill. App. 3d 326, 335-36, 517 N.E.2d 1119, 1125 (1987), *overruled on other grounds by Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 538 N.E.2d 530 (1989). By contrast, however, a servient owner may not obstruct the natural flow of surface water from

a dominant owner's property. *Mileur*, 147 Ill. App. 3d at 758, 498 N.E.2d at 583; *Gillham v. Madison County R.R. Co.*, 49 Ill. 484, 486 (1869); *Pinkstaff v. Steffy*, 216 Ill. 406, 412, 75 N.E. 163, 165 (1905); *Mauvaisterre Drainage & Levee District v. Wabash Ry. Co.*, 299 Ill. 299, 307-08, 132 N.E. 559, 563 (1921); *Gough v. Goble*, 2 Ill. 2d 577, 580, 119 N.E.2d 252, 254 (1954). See also Ralph E. Boyer, Survey of the Law of Property 300-01 (3d ed. 1981) ("Under the civil law rule it is clear that B [(owner of dominant estate)] would have the right to compel A [(owner of servient estate)] to remove his wall which obstructs the flow of the surface water onto Blackacre for the reason that Blackacre, being the lower tract as to B's land, is burdened with a servitude in favor of B's higher tract and is bound to receive and carry off such surface water which naturally flows from B's land onto Blackacre. Hence, under this doctrine A has no right to obstruct the flow of such surface water."). Rather, a servient landowner must " 'suffer the water to be discharged upon his land.' " *Geis v. Rohrer*, 12 Ill. 2d 133, 136, 145 N.E.2d 596, 598 (1957) (quoting *Gough*, 2 Ill. 2d at 580, 119 N.E.2d at 254).

¶ 33        Here, Cochran's topography survey revealed that water naturally drained west from the Swigerts' land, flowing northeast to southwest and southeast to northwest into the drainage ditch between the Gillespie and Walsh properties. Thus, Cochran's uncontradicted testimony established that the Swigerts owned the dominant estate and the Gillespies owned the servient estate. Cochran also opined that the Gillespies' berm interfered with the northeast to southwest water flow. Accordingly, the evidence showed that the servient owners, the Gillespies, obstructed the natural flow of water from the property of the dominant owners, the Swigerts.

¶ 34        Defendants rely on *McGoey v. Brace*, 395 Ill. App. 3d 847, 918 N.E.2d 559 (2009), a First District case, for the proposition that the trial court properly balanced the hardships in this case. We find *McGoey* inapposite, however, because in *McGoey*, the servient property owner did not obstruct drainage from the dominant estate; rather, she sought to relocate a driveway and sidewalk easement that she alleged caused flooding to her property. *McGoey*, 395 Ill. App. 3d at 848, 918 N.E.2d at 560-61. Thus, the *McGoey* court did not apply surface-water drainage law but, rather, applied the law set forth in *Sullivan v. Bagby*, 335 Ill. 192, 195-96, 166 N.E. 449, 450 (1929), under which a landowner could not make a "substantial" change to an easement without the consent of all parties to that easement. *McGoey*, 395 Ill. App. 3d at 850-51, 918 N.E.2d at 563.

¶ 35        The other case cited by defendants and the trial court, *Bollweg*, 353 Ill. App. 3d 560, 818 N.E.2d 873, is likewise distinguishable. In *Bollweg*, the Second District approved of a balancing approach where the dominant landowner altered the flow of water onto the servient estate. *Bollweg*, 353 Ill. App. 3d at 563, 574, 818 N.E.2d at 876, 885. In doing so, the *Bollweg* court traced the evolution of surface-water drainage law in Illinois, noting that Illinois initially followed a "civil rule," under which (1) the owner of a dominant estate possessed a natural easement over the servient estate to allow water to flow from the dominant estate to the servient estate, and (2) the servient estate was not obligated to receive surface water in different quantities or at different times than would ordinarily come to his land. *Bollweg*, 353 Ill. App. 3d at 573-74, 818 N.E.2d at 884. A "good husbandry" exception subsequently developed, permitting the owner of dominant agricultural land to alter the flow

of surface water onto a servient estate if such an alteration was required for proper husbandry of the dominant land. *Bollweg*, 353 Ill. App. 3d at 574, 818 N.E.2d at 885. Later, in *Templeton*, 57 Ill. 2d at 141, 311 N.E.2d at 146, the supreme court extended the principles behind the good husbandry exception to land located in urban and suburban settings. *Bollweg*, 353 Ill. App. 3d at 574, 818 N.E.2d at 885. Based on its review of the relevant legal principles, the *Bollweg* court concluded that when a dominant estate holder increases the rate or amount of surface-water runoff, courts should weigh the benefit to the dominant estate against the harm caused to the servient estate. *Id.*

¶ 36    Thus, *Bollweg* does not stand for the proposition that the court must balance the hardships when a *servient* landowner alters the natural flow of water. Rather, *Bollweg* merely reiterated and applied the long-standing principle that where a dominant estate alters the flow of water to a servient estate, the court should apply a reasonable-use rule. *Bollweg*, 353 Ill. App. 3d at 574, 818 N.E.2d at 885 As this court explicitly noted in *Dessen v. Jones*, 194 Ill. App. 3d 869, 877, 551 N.E.2d 782, 787 (1990), "in a situation where *** obstruction by the *servient* estate is in issue, the court is not required to apply the reasonable-use rule." (Emphasis added.)

¶ 37    Based on the foregoing, we conclude that the trial court erred by balancing the hardships in this case, which had the effect of allowing Gillespie to obstruct the flow of water from the Swigert property.

¶ 38                          B. The Camp and Kupish Claims

¶ 39    The Camps and Kupish are also listed as parties on appeal. However, the Gillespies correctly point out that the trial court did not balance the hardships with respect to the Camp and Kupish claims but, rather, dismissed their claims after finding that they were not supported by the evidence. Specifically, the court noted that Cochran's topographic study established that the Camp and Kupish properties lay north of the ridgeline and the berm caused "ponding" south of the ridgeline.

¶ 40    We conclude that the trial court's findings with respect to the Camp and Kupish claims are against the manifest weight of the evidence. The court correctly noted that Cochran's topographic map and testimony revealed that water north of the ridgeline, where the Camp and Kupish properties were located, drained northwesterly. Cochran also initially testified that the Gillespies' berm interfered with the northeast to southwest flow of water off the Swigert property.

¶ 41    However, when asked specifically by the trial court whether the berm could affect drainage onto the Camp property, Cochran testified that it "could," explaining that the ridgeline was "not that high." Cochran opined that if the area received significant rainfall, water could pond on the Swigert property and ultimately flow over the ridgeline and drain north toward the Camp property.

¶ 42    Accordingly, we conclude that the trial court's judgment with respect to the Camp and Kupish claims was against the manifest weight of the evidence.

¶ 43                                    III. CONCLUSION

¶ 44        For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 45        Reversed and remanded.



CASE NO. 4-12-0043

APPENDIX

SWIGERT
PROPERTY