NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210253-U

NO. 4-21-0253

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 3, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| LAUREN LEONFORTE CO., | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Macon County |
| GREGG MEISENHELTER | ) | No. 19MR863 |
| and MEI FARMS, INC., | ) | |
|     Defendants-Appellees. | ) | Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Plaintiff's breach-of-contract claim fails as plaintiff failed to prove the alleged breaches proximately caused its damages.

(2) Plaintiff failed to establish it was entitled to injunctive relief.

¶ 2     Defendants, Gregg Meisenhelter and MEI Farms, Inc., an Illinois Corporation, sold plaintiff, Lauren Leonforte Co., student-rental properties near Millikin University (Millikin). The parties entered into a purchase agreement, with two addenda, which created geographical restrictions on the parties' future purchases of properties and limited defendants' ability to "target" plaintiff's tenants. After Meisenhelter purchased a property in violation of the terms of the second addendum and placed signage advertising defendants' rental properties, plaintiff sued defendants for breach of contract and for injunctive relief. The trial court found no breach

occurred and ruled in defendants' favor. Plaintiff appeals, arguing the trial court erred by (1) failing to enforce the geographic restrictions of the second addendum and (2) improperly construing the term "target" by consideration of parol evidence rather than by its plain and ordinary meaning. Defendants respond, in part, by emphasizing plaintiff failed to establish damages associated with either alleged breach. We agree with defendants and affirm.

¶ 3                                    I. BACKGROUND

¶ 4            Meisenhelter is the president of MEI Farms, Inc. Since the mid-1990s, Meisenhelter was in the business of providing rental housing to Millikin students. Plaintiff, a California corporation, was authorized to do business in Illinois.

¶ 5            On February 2, 2015, plaintiff and defendants signed a purchase agreement. Under the express terms of the purchase agreement, defendants agreed to sell to plaintiff real estate "[t]o be furnished later" for an unspecified price. The agreement expressly states, "Refer to Addendum" in spaces following the "To be furnished later" language. Added in paragraph 15 is the following: "Addendum to Real Estate Purchase Agreement will superceed [*sic*] any terms in conflict in Purchase agreement." The record contains a "List of subject properties for Real Estate Purchase Contract dated February 2, 2015." The list contains 12 residences and 5 vacant lots.

¶ 6            On that same date, the parties signed an Addendum to Real Estate Purchase Agreement (First Addendum). The properties that were sold were in the 1300 block of West Wood Street and the 1300 block of West Macon Street. The purchase price for these properties was $850,000. The First Addendum further provided the following:

              "Seller agrees not to target the existing Tenants (students)

              who are currently in the subject properties now and in the future in

an effort to have them move to Seller's other rental properties. Similarly, Seller agrees not to target the future Tenants (students) in the subject properties in an effort to have them move to Seller's other rental properties, however, Seller can secure any other students for the remainder of his properties."

Defendants further agreed "during this period and pursuant to the signing of the purchase agreement not to attempt in any way to purchase any vacant lots or any homes in the 1300 block on W Wood St or W Macon St between S Fairview Ave and S McClellan Ave."

¶ 7　　　　　On March 10, 2015, the parties signed a Second Addendum to Real Estate Purchase Agreement (Second Addendum). The Second Addendum listed the same properties and same purchase price. The Second Addendum further included the same paragraph by which defendants agreed "not to target the existing Tenants (students)." The Second Addendum contained, in paragraph 10, an agreement that stated the following:

"Seller and/or any of his affiliates further agrees during this period and after the closing for so long as Buyer owns these subject properties and/or student housing and investment properties, and pursuant to the signing of the purchase agreement, not to attempt in any way, nor to purchase any vacant lots or any homes West of S. Oakland Avenue without first obtaining the written permission of the Buyer. Buyer and/or any of its affiliates further agrees during this period and after the closing for so long as Seller owns student housing and investment properties, and

pursuant to the signing of the purchase agreement, not to attempt in any way, nor to purchase any vacant lots or any homes East of S. Oakland Avenue without first obtaining the written permission of the Seller."

¶ 8 In June 2019, plaintiff filed suit, alleging breach of contract and seeking equitable relief. In July 2020, plaintiff filed a second verified amended complaint. According to the amended complaint, defendants purchased a residential home at 1383 West Main Street on or about April 20, 2018, without seeking written consent from plaintiff. Plaintiff asserted defendants breached the amended contract by purchasing 1383 West Main Street and by displaying advertising on that property that "targets, among others, the existing or future tenants of those properties which are the subject of the Amended Contract." Plaintiff contended defendants' breaches caused "damages in the form of decreased rental revenue at properties which are the subject of the Amended Contract." Plaintiff further maintained the average monthly rental revenue, since defendants' breaches, decreased by approximately $1281 and it suffered $86,493 in the reduction of the value of its rental-property portfolio.

¶ 9 Plaintiff asked the court to enter an injunction compelling defendants to (1) divest all residential properties and vacant lots west of South Oakland Avenue in Decatur, Illinois, within five miles, or other radius the court deems reasonable, of Millikin that were acquired after March 10, 2015; and (2) cease advertising of their rental properties, "including signage and physical advertisement" within five miles of Millikin, or within any radius the court deems reasonable, that may target the existing or future tenants of plaintiff's properties. Plaintiff further sought an injunction barring defendants from (1) acquiring residential properties and vacant lots

west of South Oakland Avenue, within five miles of Millikin, or any other radius the court deems reasonable, for as long as plaintiff owns and operates rental housing; and (2) advertising their rental houses within five miles of Millikin, or within such other radius as the court deems reasonable, in a manner that targets existing or future tenants of the properties subject to the Amended Contract, including signage and physical advertisement displayed west of South Oakland Avenue. Plaintiff last sought damages in the amount of $104,427 for 14 months of decreased rental revenue and reduced property value, as well as an additional $1281 per month for each month beyond August 2019 while the breaches continued and attorney fees and costs.

¶ 10　　　　　In March 2021, the trial court conducted a bench trial. Plaintiff's Exhibit No. 2 was entered into evidence. This exhibit showed 11 of the 17 properties sold were on the same city block, which was bordered on the north by West Wood Street, on the south by West Macon Street, on the east by South Fairview Avenue, and on the west by South McClellan Avenue. Four of the properties appeared to be across Wood Street on a different block. West Main Street was the north border of that city block. The property defendants purchased after the Second Addendum was signed was located on West Main Street, on the same block as four of plaintiff's properties. The remaining two properties that were a part of the 2015 sale were on the other side of West Macon Street.

¶ 11　　　　　Plaintiff's first witness was Meisenhelter. Meisenhelter testified he sold the properties to plaintiff as student housing. Doing so was key to his offering because of the value it would generate for a buyer. Meisenhelter agreed, for rental properties, one could charge more per bedroom than one could for a single-family home.

¶ 12　　　　　Meisenhelter testified he and his mother, in April 2018, purchased property west

of South Oakland Avenue, 1383 West Main Street, without first obtaining plaintiff's written permission. Three rental signs were placed on that property, advertising "for rent for the next upcoming school year, Meisenhelter Properties." The signage also contained his phone number. According to Meisenhelter, Kennedy Chandler, a former tenant of plaintiff's, signed a lease to rent 1383 West Main Street for February 2020 through May 2020. Meisenhelter denied soliciting Chandler. She was brought to defendants by a friend, who had not leased from plaintiff. Meisenhelter further reported Chandler did not list plaintiff as a previous landlord. In December 2020, Meisenhelter and his mother sold 1383 West Main Street.

¶ 13 Meisenhelter identified Plaintiff's Exhibit No. 8 as a lease signed by Jackson Delfosse and Marissa McElroy for one of his properties east of Oakland Street. Both Delfosse and McElroy had previously rented from plaintiff.

¶ 14 On cross-examination, Meisenhelter testified he believed the purchase of 1383 West Main Street did not violate the contract as the property was not on Wood or Macon Streets. There were no tenants in that property during the 2018-19 school year. On McElroy's and Delfosse's application to rent from defendants, both indicated they learned about the rental from their friend who already resided in that house. Meisenhelter had no contact with McElroy before she applied to live in the house.

¶ 15 Meisenhelter testified when he first started the rental business, less than 5% of his tenants were not students. At the time of his testimony, Meisenhelter provided a rough estimate 50% of the tenants were students. Meisenhelter believed the student pool had gotten smaller and Millikin had "enticed its students to stay on campus longer." According to Meisenhelter, his gross revenues from rentals in the 2015-16 school year were $382,845. For 2016-17, they were

$314,000. In 2017-18, gross revenues were $249,842. In 2018-19, gross revenues were $189,000. In 2019-20, they were $134,000. Meisenhelter believed he may have sold a few houses in those years but not many. Fourteen or fifteen houses were "maybe" responsible for generating that revenue. He had sold three or four houses during those years.

¶ 16 Shefina Gorrell, property manager for Meisenhelter, testified she received calls from individuals looking to see a house or an apartment. All prospective tenants had to complete application materials. However, "the second page" of those materials was required only for former tenants of plaintiff. When McElroy and Delfosse applied, they indicated they were plaintiff's tenants. Gorrell then asked the two to complete the second page. When asked if she took any other steps to avoid leasing Meisenhelter's properties to plaintiff's tenants, Gorrell said, "I guess this is the first time that had came up that we actually had somebody coming from one of [plaintiff's] properties. I don't think I've ever had anybody else."

¶ 17 Plaintiff's Exhibit No. 10 was McElroy's application. Under the preprinted text, "How did you hear/learn about the rental house at 1076 W. Main St," it was written, "Our friend Nick lived there and had extra rooms." Two preprinted questions also asked the applicant if he or she had heard of defendants or been solicited by Meisenhelter or Gorrell to rent from defendants. The lines next to "No" were checked.

¶ 18 Christopher Harrison, a real-estate broker, was the listing agent for the sale of properties from defendants to plaintiff. Harrison was familiar with Decatur's real-estate market. According to Harrison, the student-housing market for Millikin students was within a half mile of campus. Within a block of campus "is ideal."

¶ 19 Harrison testified he was the sole member of Home Again Properties, LLC,

which, in December 2020, purchased 1383 West Main Street from Meisenhelter and his mother. A sign on the property belonging to Harrison indicated the property was available as student housing. On cross-examination, Harrison testified 1383 West Main Street was marketed to the public before he purchased it. When asked why the properties were less valuable than when sold, Harrison testified to the following:

> "There's fewer students that are there to rent now. Millikin has The Woods. Generally everybody knows what The Woods is. Millikin has—my understanding is Millikin has an agreement to meet certain requirements of revenue to The Woods, and if they don't, they have to make up that difference, so what that's done is Millikin has been more restrictive and forced more students to rent at The Woods, which means you have homes that are pushing that, if it's a half mile, that two[-] or three[-]block threshold, students used to walk three blocks from campus. Well, now, that is moving in and then you have families moving in, and that's moved all the rents down."

Harrison agreed the rental market had declined significantly in the previous five years.

¶ 20    Stefan Marchal, plaintiff's chief executive officer, testified he negotiated with defendants for the purchase of rental properties near Millikin. The parties entered the Second Addendum because Marchal wanted to add two properties on the west side that were not in the initial offering memorandum. Those properties were 233 and 225 South Fairview. Marchal also wanted to expand the area in which defendant was not to purchase property relevant to student

housing. Marchal described himself as "a newcomer in the business" while Meisenhelter "was very much established." Marchal bought all of defendant's properties that were west of Oakland. The property located at 1383 West Main Street was "behind one of [plaintiff's] houses" in "a high foot[-]traffic area *** to Millikin." McElroy and Delfosse were tenants of plaintiff's for 12 months ending May 20, 2020.

¶ 21        When asked if defendants' breaches, including "buying the prohibited property at 1383 [West Main Street] and their advertising in your neck of the woods," impacted rental revenues, Marchal testified, "I believe so, yes." When asked how, Marchal testified, "Well, they went down." In the fiscal year ending June 2017, the gross rents received was $246,868. For the year ending June 2018, the gross rents were $247,090.68. For the year ending June 2019, the gross rents were $231,597.34. The amount per month lost was $1281.83. Before the breaches, the fair market value of the portfolio was $1,091,157.30. After the breach, it was $851,899.16. Marchal testified he incurred other expenses because of the breach, expenses "to increase the attractiveness of [his] properties" given there was "an additional big player right in [his] backyard," as well as attorney fees.

¶ 22        On cross-examination, Marchal testified his student rentals were full for the 2020-21 school year. For that reason, he did not believe defendants' ability to rent to only 50% students was the result of Millikin's pressure to get students into The Woods. Marchal, when counsel suggested defendants had not harmed plaintiff that 2020-21 year, Marchal testified, "You can have that opinion. He has also sold a house. He has removed his signs." Marchal said the previous school year, the occupancy rate "definitely wasn't full."

¶ 23        According to Marchal, he began marketing the properties as furnished around

May 2020. About half of his houses were unfurnished. When he started renting to Millikin students, all were unfurnished.

¶ 24　　　　For the defense, Raphaella Prange, vice president for student affairs at Millikin, testified. Prange was aware of the university regulations for student eligibility for off-campus housing. According to Prange, there was a three-year residency policy at Millikin, meaning a student is ineligible to live off campus until their seventh semester. A student must also have resided in campus housing for three years total. Even students who graduated early were not permitted to move off campus until those three years were satisfied. In addition, students wanting to live off campus had to file an off-campus petition to receive permission from the university. Prange testified the university kept records of students who were eligible for off-campus living. Those records were reflected in Defendants' Exhibit No. 3. The first column were seniors enrolled at Millikin. In 2015-16, 320 seniors were enrolled, 200 of which were approved for off-campus housing. In 2016-17, there were 293 seniors enrolled, with 202 approved for off-campus housing. In 2017-18, there were 264 seniors, with 184 approved for off-campus housing. In 2018-19, there were 254 seniors and 141 approved for off-campus housing. In 2019-20, there were 282 seniors with 116 approved for off-campus housing.

¶ 25　　　　On cross-examination, Prange testified all Millikin students were eligible to live in The Woods complex, which was considered on-campus housing. Sorority and fraternity housing was also considered on-campus. Prange believed the apartment-style living at the Woods was not necessarily similar to residing in an apartment in the community as The Woods residents were all college students.

¶ 26　　　　Jackson Delfosse testified he was a tenant of plaintiff's from June 2019 to May

2020. At that time, he resided with McElroy and Skyler Harris. Delfosse and McElroy talked to Marchal about leasing beyond May 2020 but were told they could stay only if they signed a year agreement or had two other people sign for a year. Delfosse, however, had only one semester remaining until graduation. He did not want to sign a year lease. He then texted his former roommate, Nick Marion, and moved in with him in another Meisenhelter property. Delfosse testified Meisenhelter did not solicit him or McElroy in any way.

¶ 27 In April 2011, the trial court entered its written order, finding in favor of defendants. The court observed, in reviewing the documents, a handwritten clause in the purchase agreement provided, "Addendum to Real Estate Purchase Agreement will supersede any terms in conflict in Purchase Agreement," but no similar clause was set forth in either the First Addendum or Second Addendum. The court concluded, absent the "superseding" language, it was unclear which geographical restriction applied. The court found, because plaintiff drafted the inconsistent language, the language in the First Addendum applied and defendants' purchase of 1383 West Main Street did not constitute a breach.

¶ 28 Regarding the "targeting" argument, the trial court found the term "targeting," in the context of the contract, meant "direct solicitation" and concluded the signs were advertising, not targeting. The court reasoned its interpretation was consistent with the provision in the addenda Meisenhelter "can secure any other students for the remainder of his properties."

¶ 29 This appeal followed.

¶ 30 II. ANALYSIS

¶ 31 On appeal, plaintiff argues it satisfied its breach-of-contract claim. Plaintiff contends the trial court erred by not applying the geographical restriction of the Second

- 11 -

Addendum, which, according to plaintiff, changed the agreement of the parties and did not create an ambiguity. Plaintiff asserts under the Second Addendum, defendants' purchase of 1383 West Main Street breached the contract. Plaintiff further argues the court erred in deciding the term "target" meant direct solicitation and did not apply to the use of signs near plaintiff's properties.

¶ 32    To establish a claim for breach of contract, a plaintiff must establish the existence of a valid and enforceable contract, a plaintiff's performance of the contract, the defendant's breach of that contract, and resulting injury to the plaintiff. *Barry v. St. Mary's Hospital Decatur*, 2016 IL App (4th) 150961, ¶ 78, 68 N.E.3d 964. "The basic theory of damages in a breach of contract action requires that a plaintiff 'establish an actual loss or measurable damages resulting from the breach in order to recover.' " *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶ 19, 994 N.E.2d 553 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 149, 835 N.E.2d 801, 832 (2005)). Damages that "are not the proximate cause of the breach are not allowed." *Id.* A plaintiff who seeks damages carries the burden of proof to show it sustained damages resulting from the defendants' breach. See *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 16, 996 N.E.2d 652.

¶ 33    While plaintiff presents compelling arguments the language of the Second Addendum controls and the purchase of 1383 West Main Street was a breach of that addendum and the placement of signs on the property purchased in breach of contract is targeting students on plaintiff's side of South Oakland Avenue, plaintiff has not met its burden of proving the damages alleged were the proximate cause of the breach. Plaintiff has shown its portfolio declined substantially and it had lost rental income. Plaintiff, however, has not shown defendants' purchase of 1383 West Main Street and the posting of signs on that property was the

proximate cause of that damage. When Marchal was asked about a link, he testified he "believed so," but he relied only on the decrease in value and rental income as proof of that link. The record contains evidence the rental market had been in decline. Plaintiff's own witness testified to the decline and Millikin's restrictions pushing students to use on-campus housing. Testimony from a Millikin vice president showed the enrollment of seniors, which students have to be at a minimum in order to be eligible for non-commuting, off-campus housing, had decreased, as had the numbers of students approved for off-campus housing. In addition, plaintiff identified no students who saw the signage and, as a result, elected to rent from defendants as opposed to plaintiff. The record shows only a few of plaintiff's former tenants later leased from defendants, but testimony and evidence show the move was not due to signage. Only one of those former tenants leased 1383 West Main Street, for a three-month period, and there is no evidence or testimony showing that tenant would have rented from plaintiff had defendant not purchased 1383 West Main Street.

¶ 34　　　Plaintiff attempts to discount Harrison's testimony about an alleged decline in the rental market by arguing Harrison's testimony is undermined by the fact he purchased 1383 West Main Street from defendants. Plaintiff asserts if the market was declining, Harrison would not have purchased that property. This argument carries no weight. There is no testimony from Harrison establishing the purchase price for the property did not reflect a decline in the rental market. Plaintiff further discounts Meisenhelter's decreasing lost gross profits by emphasizing Meisenhelter sold properties and decided to accept lower-paying non-students in his rentals. Even without consideration of Meisenhelter's situation, the record contains sufficient evidence of a decline in the rental market and the availability of students to use off-campus housing to

undermine any inference plaintiff's losses were caused by the three signs on 1383 West Main Street.

¶ 35        At best, plaintiff has shown two events occurred—a breach and a loss in income and value. Plaintiff has shown no causal link between the two and, therefore, cannot prevail on its breach-of-contract claim.

¶ 36        In its reply brief, plaintiff asks this court "[r]egardless of the disposition of Plaintiff's prayers for contract and other money damages" to "independently adjudicate Plaintiff's prayers for injunctive relief and consider an award of nominal damages if warranted." Plaintiff, however, has developed no argument and cited no legal authority for this court to determine whether injunctive relief should be awarded. To obtain injunctive relief in the form of a permanent injunction, the party seeking that injunction must show "(1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists." *Swigert v. Gillespie*, 2012 IL App (4th) 120043, ¶ 27, 976 N.E.2d 1176. Plaintiff has not cited these elements or attempted to explain how irreparable harm will occur when there is no evidence defendants have purchased and currently own student-rental property west of South Oakland Avenue or have signage in that area. We will not research and make these arguments for plaintiff. The issue of injunctive relief is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited.").

¶ 37                        III. CONCLUSION

¶ 38        We affirm the trial court's judgment.

¶ 39        Affirmed.

- 14 -